772 So.2d 306 (2000)
Vonda HAMMOCK on behalf of her minor child, Alexis THOMPSON, Plaintiff-Appellee,
v.
LOUISIANA STATE UNIVERSITY MEDICAL CENTER IN SHREVEPORT, et al., Defendant-Appellant.
No. 34,086-CA.
Court of Appeal of Louisiana, Second Circuit.
November 1, 2000.
*309 Casten & Pearce by Claude W. Bookter, Jr., Shreveport, Counsel for Appellant.
W. James Singleton, Sam L. Jenkins, Jr., Shreveport, Counsel for Appellee.
Before NORRIS, C.J., and WILLIAMS and KOSTELKA, JJ.
NORRIS, Chief Judge.
Louisiana State University Medical Center (LSUMC) appeals the quantum of an award to Vonda Hammock, on behalf of Alexis Thompson, for the mis-diagnosis and delay in treatment of a Monteggia fracture. We affirm.

Facts
On October 26, 1996, while unsupervised, four-year-old Alexis fell when she climbed onto a chair in an attempt to get a balloon. Vonda Hammock, Alexis' mother, heard a commotion and found Alexis on the floor beside the overturned chair. Vonda took Alexis to North Caddo Medical Center in Vivian where x-rays were taken. Alexis' arm was placed in a tourniquet and Vonda was told to take her to LSUMC to see an orthopedic surgeon. Vonda transported Alexis to the emergency room of LSUMC, where Dr. Danese x-rayed her arm, diagnosed her with a "greenstick" fracture and put a cast on her arm. Over the next few months, Alexis had several more x-rays done and had to have her arm reset and recast. According to Vonda, Alexis went to two to three appointments a month from October until December.
On January 8, 1997, Vonda received a call from a Dr. Craig who informed her that he had looked at previous x-rays and discovered that Alexis had a Monteggia fracture, a fracture of the radius resulting in a radial dislocation, which had thus far gone undiscovered. Dr. Craig scheduled an appointment for Alexis the next day and told Vonda that Alexis would have to undergo emergency surgery or risk losing her arm. Alexis underwent surgery on January 16, at which time two pins were put in her arm to hold the radial head down in an attempt to keep it in the socket. Alexis underwent a second surgery on February 6, when an additional three pins were placed in her arm. On March 20, Alexis underwent a third surgery when three of the pins were removed; two were imbedded in the bone. When the remaining pins started giving Alexis trouble, Vonda took her to Dr. Don Burt who, on June 10, removed them.
Vonda, on behalf of Alexis, filed suit against LSUMC for the mis-diagnosis of the Monteggia fracture. LSUMC stipulated that the standard of reasonable care was breached in failing to treat the dislocation of the radial head and waived the use of the Medical Review Panel. The case went to trial on the issue of quantum. Prior to trial, LSUMC filed a motion in limine seeking to exclude any evidence of lost earning capacity arguing that due to Alexis' age it was too speculative. The trial court denied the motion and this court denied LSUMC's writ challenging that ruling. After trial, the judge awarded Alexis general damages in the amount of $160,000, and special damages of $150,000 for loss of earning capacity, $8,500 for future surgery, and medical expenses not contested on appeal. Additionally, the trial court designated expert fees of $700 for Dr. Don Burt, Dr. Luvonia Caperson, Lenora Maatouk and $1,500 for Dr. Douglas W. McKay to be taxed as costs payable by LSUMC. LSUMC appeals the awards for general damages, loss of earning capacity, future medical expenses, and expert fees.

Law and Analysis: General Damages
LSUMC argues that the award of $160,000 in general damages is excessive and an abuse of the trial court's discretion.
The trial court has much discretion in the assessment of damages in tort cases. La. C.C.P. 2324.1. The discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. An appellate court may disturb a damage award only when the record clearly *310 reveals that the trial court abused its discretion in making the award, based on the facts and circumstances peculiar to the case and the individual under consideration. Hae Woo Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Only after an articulated analysis of the facts discloses an abuse of discretion is examination of prior awards in similar cases proper; an abusively low award is raised to the lowest amount the trier of fact could have reasonably awarded, while an abusively high award is reduced to the highest amount the trier of fact could have reasonably awarded. Powell v. RTA, 96-0715 (La.6/18/97), 695 So.2d 1326; Dixon v. Tillman, 29,483 (La.App.2d Cir.5/7/97), 694 So.2d 585, writ denied, 97-1430 (La.9/19/97), 701 So.2d 174. The proper procedure for examining whether an award is excessive is to determine whether the amount can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the trier of fact; likewise, to determine if an award is inadequate, the evidence must be viewed in the light most favorable to the defendant. Manuel v. State Farm Mut. Auto. Co., 30,765 (La.App.2d Cir.8/19/98), 717 So.2d 277.
According to the medical records, Alexis underwent four separate surgeries, two to place pins in her arm and two to remove the pins. The first surgery was on an emergency basis due to the imminent danger of her losing her arm. The second surgery was done because the radial head was still out of the socket. The third and fourth surgeries were done because Alexis was suffering discomfort from the pins in her arm. After the third surgery, Vonda was informed by Dr. Hollister's clinic that the last two pins were embedded, as such they could not remove them without chiseling the bone and possibly causing additional problems. Despite the assurance that the last two pins would not cause Alexis problems, these pins later caused her discomfort and had to be removed. Despite all these efforts and surgeries, the radial head is still not in place.
Dr. McKay testified that another surgery might get the radial head back in place, but there was a high risk of losing even more motion; there was no guarantee or even a good percentage of a positive result. Consequently, he suggested waiting until Alexis was 15 or 16 years of age where there was a better chance of getting the radial head back in place and getting back more motion.
Dr. McKay testified that Alexis lost 20° of flexion in her arm. Additionally, she lost 50° supination and 70° of pronation of the wrist. Dr. McKay evaluated Alexis as having a 16% impairment of the upper extremity and a 10% impairment of the whole body. He did state that given her youth she would be able to adapt; however, this would not be the result of any increased range of motion in her elbow.
Vonda testified that Alexis likes to ride her bike, swing, swim, and play baseball. She did note that Alexis has difficulty in playing baseball because she cannot hold the bat. She further testified that Alexis has difficulty eating because she cannot properly twist her arm to get a utensil to her mouth. Vonda stated that Alexis has lost her confidence and that other children often ask about her arm because of the ugly scar on it. Additionally, Vonda expressed concern about Alexis' opportunity to do things such as cheer, be on the dance line, and play softball in high school due to her impairment and the likelihood of her having to undergo another surgery during that time.
Diana Hicks, Alexis' P.E. teacher, and Melba Jones, her second grade teacher, both testified that Alexis does not have any difficulty in their classes and they have never noticed a problem with her arm. Cathy Sullivan, Alexis' first grade teacher, also testified to Alexis' lack of limitation. Ms. Sullivan did testify that Alexis takes longer to write and holds her *311 pencil differently; when she writes she unnaturally curves her arm. Although Alexis' teachers testified to her lack of impairment and her abilities, her "excellent handwriting" appears to be due to the extended amount of time given to complete a task. Additionally, although none of the teachers have heard children tease Alexis about her scar, it is not unreasonable to attribute this to peers teasing each other more when adults are not around. Furthermore, the teasing and loss of self-confidence because of an ugly scar will increase with age.
In sum, as stated by the trial court, Alexis had to undergo several surgeries and endure much pain, agony and discomfort. She will also have to endure further pain to help lessen the disability; however, based on the testimony, this is a lifetime disability. Based on the facts and circumstances of this case, an award of $160,000 in general damages is not an abuse of the trial court's great discretion. See Boddie v. State, 27,313 (La.App.2d Cir.9/27/95), 661 So.2d 617 ($95,000 awarded to an adult who broke her wrist and arm); Litton v. Ford Motor Co., 554 So.2d 99 (La.App. 2d Cir.1989), writ denied 559 So.2d 1353 (La. 1990) ($411,830 awarded to child who had 50% disability of his shoulder); Hollingsworth v. Bowers, 96-257 (La.App. 3d Cir.12/30/96), 690 So.2d 825 ($500,000 awarded to a child who lost the use of an arm due to nerve damage); Rivere v. Union Pacific R. Co., 93 1132 (La.App. 1st Cir.10/7/94), 647 So.2d 1140, writ denied 95-0292 (La.3/24/95), 651 So.2d 295 ($400,000 awarded to an adult who had to undergo seven operations on his arm and had a permanent partial disability); Riser v. Acadiana Limousine Service, Inc., 96-1687 (La.App. 3d Cir.4/30/97), 693 So.2d 330, writ denied, 97-1420 (La.9/19/97), 701 So.2d 173 ($400,000 awarded to an adult who suffered injuries to his arm resulting in a fracture, lacerations, and nerve damage).

Loss of Earning Capacity
LSUMC also argues that loss of earning capacity is too speculative for a child Alexis' age. In the alternative, they argue that an award of $150,000 is excessive since Alexis suffers from Triple X syndrome and Attention Deficit Disorder (ADD). They also argue that the trial court erred in refusing to accept the testimony of Janet Papworth, their expert in vocational rehabilitation.
Loss of earning capacity refers to a person's potential and is not necessarily determined by actual loss. Batiste v. New Hampshire Ins. Co., 94-1467 (La. App. 3d Cir.5/3/95), 657 So.2d 168, writ denied, 95-1413 (La.9/22/95), 660 So.2d 472. The plaintiff need not be working or even in a certain profession to recover this type of award. Id. What is being compensated is the plaintiffs lost ability to earn a certain amount and he may recover such damages even though he may never have seen fit to take advantage of that capacity. Id.
In determining whether a personal injury plaintiff is entitled to recover for the loss of earning capacity, the trial court should consider whether and how much plaintiffs current condition disadvantages him in the work force. Id. Some factors to be considered in determining loss of earning capacity include plaintiffs physical condition before and after his injuries, his age and life expectancy, the amount plaintiff probably would have earned absent the injuries, the probability he would have continued to earn wages over the balance of his life. Williams v. City of Monroe, 27,065 (La.App.2d Cir.7/3/95), 658 So.2d 820, writs denied, 95-1998, 95-2017 (La.12/15/95), 664 So.2d 451, 452.
Even young children are entitled to an award for loss of earning capacity. See Williams v. City of Monroe, supra. (award for loss of earning capacity to a six-year old affirmed); Hollingsworth v. Bowers, supra (award for loss of earning capacity for newborn affirmed); Jackson v. *312 Huang, 514 So.2d 727 (La.App. 2d Cir. 1987), writs denied, 518 So.2d 1050, 519 So.2d 119 (La.1988) (award for loss of earning capacity for newborn affirmed).
Awards for lost income are speculative and cannot be calculated with absolute certainty. Williams v. City of Monroe, supra. The trial court is accorded broad discretion in assessing them, but there must be a factual basis in the record for the award. Id.
Credibility determinations, including the evaluation of expert testimony, are factual issues to be resolved by the trier of fact. Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993); Orea v. Scallan, 32,622 (La.App.2d Cir.1/26/00), 750 So.2d 483; Nichols v. Nichols, 32,219 (La.App.2d Cir.9/22/99), 747 So.2d 120. Where the testimony conflicts, the fact finder's reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even where the appellate court may feel that its own evaluations and inferences are more reasonable than those of the jury. Stobart v. State, Through DOTD, supra.
Vonda testified that Alexis has been diagnosed with ADD and is taking medication. Additionally, Alexis has Triple X Syndrome. According to Vonda, the only problem associated with Triple X Syndrome is that girls who have the syndrome tend to be sterile. Lenora Maatouk, an expert in the field of vocational rehabilitation counseling, testified that females with this syndrome also tend to have IQs of 90 or below.
Ms. Maatouk conducted a vocational evaluation on Alexis and reviewed Dr. McKay's reports as to Alexis' loss of flexion, supination, pronation and the resulting impairments. Ms. Maatouk additionally gave Alexis an IQ test; Alexis' IQ on the Slosson Intelligence test was 80 which equates to a Wechsler's IQ of 81. Ms. Maatouk testified that in evaluating an eight year old's vocational future she generally looks at the family's education and work history. Ms. Maatouk stated that Vonda has some college education and has generally done semi-skilled to skilled labor. She further testified that given Alexis' ADD and Triple X Syndrome, she was unlikely to achieve her mother's level of work and is limited to unskilled to the bottom level of semi-skilled labor. Based on this information, Ms. Maatouk testified that pre-injury, Alexis had access to approximately 2,675 jobs, and post injury this decreased to 482 jobs. Ms. Maatouk testified that Alexis' future careers are limited by a combination of ADD, Triple X Syndrome, and the instant injury; the injury noticeably increased her loss of access to the job market.
Dr. Luvonia Casperson, expert in the field of economics, using the information provided by Ms. Maatouk, testified that the average female high school graduate has a future earning capacity of $823,314 if she works until age 46.5 and $1,239,457 to age 67. The same employee, if she never works for more than minimum wage, would have an earning capacity of $402,848 if she works until age 46.5 and $606,467 if she works until age 67. Dr. Casperson did not assess an offset for work that Alexis may do in the future because, based on Ms. Maatouk's report, she assumed that Alexis would be completely unable to work or extremely restricted in the workplace.
Dr. Melvin Harju, LSUMC's expert in the field of economics testified that for a female with a high school diploma, working until age 67, the earning capacity would be $587,156. If Alexis did not finish high school, her earning capacity would drop to about $274,766$280,255. He testified that the missing link in the plaintiffs expert evidence was that there was no way to determine if the available jobs lost were the lowest or highest paying ones.
Janet Papworth, LSUMC's expert in vocational rehabilitation counseling, testified that there was no support for much of a loss of earning capacity due to the arm injury. She stated that any impairment *313 with work was due to ADD and the Triple X Syndrome. She further testified that the doctors had not been specific about functional limitations and the figures given "meant nothing" to her "other than the fact that there is a disability or an impairment."
The trial court chose to place more credibility on the plaintiff's expert, a reasonable evaluation which we will not disturb. Stobart v. State, Through DOTD, supra. Both economic experts testified that Alexis' earning capacity was over $250,000 if she dropped out of high school and over $550,000 if she finished high school. They also agreed that she had a loss of available jobs. The trial court awarded Alexis $150,000 in loss of earning capacity, less than one-fourth of what she could have made as a high school graduate but for this injury. The trial court did not abuse its discretion in determining that because Alexis' job availability was limited to lower-skilled labor, her injury was more onerous than if she could have done labor that required less hand mobility. In sum, the trial court did not abuse its discretion in awarding Alexis $150,000 in loss of earning capacity. This assignment is without merit.

Future Medicals
LSUMC argues that the trial court erred in awarding future medical expenses because, based on Vonda's testimony that she would have concerns if the likelihood of success was less than 100%, Alexis would likely forgo future surgeries.
Future medical expenses, like any other damages, must be established with some degree of certainty. Morris v. United Services Automobile Assoc., 32,528 (La.App.2d Cir.2/18/00), 756 So.2d 549; Sengsouly v. Allstate Ins. Co., 99-22 (La. App. 3d Cir.6/9/99), 744 So.2d 649, writ denied 99-2526 (La.11/19/99), 749 So.2d 677. Awards for future medical expenses that may or may not be incurred require medical testimony that they are indicated and their probable costs. Id. The plaintiff must show that, more probably than not, these expenses will be incurred. Morris v. United Services Automobile Assoc., supra; Morrison v. Kappa Alpha Psi Fraternity, 31,805 (La.App.2d Cir.5/7/99), 738 So.2d 1105, writs denied 99-1668, 99-1607, 99-1622 (La.9/24/99), 747 So.2d 1120, 749 So.2d 634, 635.
Dr. McKay testified that when Alexis reaches 15 or 16 years of age, she will have the option of undergoing an additional surgical procedure to put the radial head back in place. He stated that this procedure might give her more mobility. He testified; however, that this surgery may not be an option if she develops synchondrosis, a bone growing across the two arm bones. He did testify that if she did not undergo this procedure, she will experience discomfort and be more inclined to get arthritis.
Vonda testified that she was not sure whether she would allow Alexis to undergo future surgery; she would have to make that decision based on the information before her at that time. She also stated that she would have serious concerns based on the success rate of the surgery.
On this evidence the Trial Court was entitled to find that the surgery would be beneficial and that, more probably than not, Alexis would undergo it. It is understandable that Vonda would have concerns; however, she did not state that she would not allow Alexis to undergo the procedure, only that she would have reservations. Based on the evidence that Alexis will have problems without the future surgery and that the surgery could increase her mobility, the trial court did not abuse its discretion in awarding future medicals. Since Dr. McKay stated that the surgery would cost between $8,000 and $9,000, it is not an abuse of discretion for the trial court to award $8,500. This assignment lacks merit.

Expert Fees
LSUMC challenged the trial court's award of expert fees as excessive and unsupported by any documentation.
*314 Witnesses called to testify as expert witnesses shall be compensated for their services, with the amount to be determined by the court and taxed as costs to be paid by the party cast in judgment. La. R.S. 13:3666; Orea v. Scallan, supra. An expert witness is entitled to reasonable compensation for his court appearance and for his preparatory work. Id. The trial judge is not required to set an expert fee at the amount charged by the expert witness. Id.; Stonecipher v. Mitchell, 26,575 (La.App.2d Cir.5/10/95), 655 So.2d 1381. The trial judge has great discretion in awarding and fixing costs and expert fees. A trial court's assessment of costs can be reversed by an appellate court only upon a showing of abuse of discretion. Id.; Smith v. Scott, 26,849 (La.App. 2 Cir. 5/10/95), 655 So.2d 582, writ denied, 95-1450 (La.9/22/95), 660 So.2d 475.
Factors to be considered by the trial judge in setting an expert witness fee include time spent testifying, time spent in preparatory work for trial, time spent away from regular duties while waiting to testify, the extent and nature of the work performed, and the knowledge, attainments and skill of the expert. Id. Additional considerations include helpfulness of the expert's report and testimony to the trial court, the amount in controversy, the complexity of the problem addressed by the expert and awards to experts in similar cases. Id.
The trial court awarded Dr. Burt, expert medical doctor with a speciality in orthopedic surgery, $700. Dr. Burt testified as to the procedures he conducted on Alexis and as to her degree of impairment. Additionally, Dr. Luvonia Casperson and Lenora Maatouk were also awarded $700. These experts reviewed all the relevant records and evaluated Alexis' functional levels. The trial court awarded Dr. McKay, expert medical doctor with a specialty in pediatric orthopedic surgery, $1,500. Dr. McKay evaluated Alexis on two separate occasions and testified not only to her level of functioning but to her future medical options. Additionally, the trial court noted that Dr. McKay was coming from out of town and should be compensated adequately for his travel and for the time he spent away from his practice. Based on the preparation time, the testimony elicited, and the degree the trial court relied on the testimony of these individuals, the amount awarded was not an abuse of the trial court's discretion. This assignment lacks merit.

Conclusion
The trial court's award of $160,000 in general damages, $150,000 in loss of earning capacity, $8,500 in future medicals, and expert fees are affirmed for the above reasons.
AFFIRMED.