794 So.2d 962 (2001)
CITY OF SHREVEPORT, Plaintiff-Appellee,
v.
CHANSE GAS CORPORATION, et al., Defendant-Appellants.
Nos. 34,958-CA, 34,959-CA.
Court of Appeal of Louisiana, Second Circuit.
August 22, 2001.
*966 Darrell Keith Cherry, New Orleans, Joseph Walter Greenwald, Baton Rouge, Billy Ray Pesnell, Shreveport, John Whitney Pesnell, New Orleans, Counsel for Appellants.
C. Gary Mitchell, Charles Gordon Tutt, Shreveport, Thomas Anthony Bordelon, Natchitoches, Jennifer Pool McKay, Counsel for Appellee.
Before NORRIS, CARAWAY and KOSTELKA, JJ.
NORRIS, Chief Judge.
The City of Shreveport filed these two suits to expropriate three tracts of land on the northwest corner of Caddo and Market Streets for the purpose of building a convention center complex. The property owners, Chanse Gas Corp. and Harold S. Hollenshead,[1] contested the City's action. After a five-day taking trial, the District Court approved the expropriation, finding a valid public purpose and legitimate public interest. The parties then proceeded to a compensation trial in which the jury unanimously fixed the market value of the property and awarded moving and other expenses to the defendants; judgments were rendered accordingly for a total of $1,055,635. Finally, the Court held a contradictory hearing, after which it awarded attorney fees of $200,000 and costs of $51,612.88, each only a portion of the amount claimed by the defendants.
The defendants appeal devolutively, contesting the finding of a public purpose and demanding that the property be restored; they also seek additional attorney fees and costs. The City answers the appeal, seeking to reverse or reduce the award of attorney fees and costs. For the reasons expressed, we affirm.

Factual and procedural background
Since at least 1998, government leaders of the City of Shreveport, as well as civic and business leaders, had advocated the need for a new, larger convention center. In January 1998 the City hired Ernst & Young, the large accounting and management firm, to conduct a convention center study. Ernst & Young's report, delivered to the City in July 1998, recommended building a new, state-of-the-art convention center and predicted its success as "the means to transition Shreveport's meetings industry from primarily local to the next level." This report also suggested that the City "foster the development" of a convention headquarters hotel. The report was made public and copies were distributed to the media.
The mayor at the time, "Bo" Williams, appointed a committee to study the report and consider how to implement its proposals. The committee strongly supported the plan, citing its benefits for economic development and improving the character of downtown. When the current mayor, Keith Hightower, assumed office in November 1998, he received the committee's report and named a new committee[2] to decide how the matter should be presented *967 to the voting citizens of Shreveport. This committee recommended a bond issue be presented to voters on July 17, 1999, for authority to sell $85 million in bonds to build the convention center and parking garage. Bonds were to be repaid out of Harrah's Casino revenues. The committee vigorously promoted the bond issue. According to testimony, special emphasis was placed on the 1,300 permanent jobs with $25 million in wages, and $3.5 million in annual taxes that the convention center was predicted to generate. There was less emphasis on its projected $1 million annual deficit. The bond issue passed overwhelmingly, approving funds for the project.[3] The City planned to induce a private developer to build the headquarters hotel, but despite its efforts none had expressed interest in doing so.
The City then contracted with Slack, Alost, Miremont & Associates, architects ("SAM"), which assembled a team of architects, real estate developers and hotel consultants to develop the convention center in accord with the bond issue.[4] The team was to assess various requirements of the convention center, particularly a contiguous 300,000 sq. ft. location, with due regard to cost, environmental impact, long range planning and safety considerations. The team also assessed whether the convention hotel was economically feasible. It advised that without an adjacent headquarters hotel, the convention center would not appeal to large or regional groups, and would be no more than a civic center. It therefore advised that the hotel was essential to the success of the convention center.
Although the initial Ernst & Young report had suggested a location close to the riverfront, entertainment district and casinos, both mayors' committees approved slightly expanding the target area. After exhaustive consideration, SAM and the other consultants found the only practicable location was a three-block strip on the north side of Caddo Street, which the City began making efforts to purchase.
The selected area included Chanse and Hollenshead's warehouse and parking lot and Chanse's office building. They had bought these properties in early 1997 for a total of $246,000. In August 1999, they listed them for sale for a total of $750,000. Days later, Hollenshead read in The Times that the City was considering that location; he raised the asking price to $900,000. On August 25, the City offered the defendants a total of $512,000 for the three tracts, in accord with its appraisals; they refused. The City gradually increased its bids, offering $750,000 on January 5, 2000.[5] This offer was also refused. In the meantime, the City Council authorized an expropriation action; the City filed the instant suits on January 11, 2000. The defendants vigorously denied the City's right to expropriate, but alternatively demanded over $3.25 million in compensation. The cases were consolidated for trial.
The taking trial was held May 24-31, 2000. Pursuant to La. R.S. 19:105, this was a bench trial. The court received extensive testimony and documentary evidence regarding the convention center and *968 hotel, notably the City's claim that the project promoted economic development for the City and its residents, and thus served public purposes and the public interest. La. Const. Art. 1, § 4; R.S. 19:102. The defendants contended that economic development is not a public purpose; their witnesses testified that the project would actually be a financial drain on the City, that it would interfere with other ongoing City projects, that the headquarters hotel would compete with existing hotels, and that the City would ultimately have to donate property to a hotel developer in order to induce the construction of the hotel.
By written reasons for judgment, the District Court listed both sides' contentions and analyzed them. Citing Town of Vidalia v. Unopened Succession of Ruffin, 95-580 (La.App. 3 Cir. 10/4/95), 663 So.2d 315, and Board of Com'rs v. Missouri Pacific R. Co., 625 So.2d 1070 (La.App. 4 Cir.1993), writs denied 93-3100, 93-3088 (La.1/28/94), 630 So.2d 802, cert. denied 512 U.S. 1220, 114 S.Ct. 2707, 129 L.Ed.2d 835 (1994), the court held that economic development in the form of a convention center with a supporting hotel is indeed a public purpose and in the public interest. Weighing all the evidence, the court concluded that while the project "is not without some potential risk, the City has demonstrated reasonable, prudent and sound discretion as well as good faith." The court therefore adjudicated that the properties be expropriated and ordered a jury trial on compensation.
The compensation trial took place August 21-25, 2000.[6] The City's experts appraised the tracts at approximately $600,000. Hollenshead admitted that he and Chanse's president, Mr. Kai S. Chang, had paid $63,000 for the warehouse in 1997, but he estimated he had spent $200,000 improving the structure and remodeling it into a luxury apartment, private office and showroom for his antique cars and other collectibles; most of these improvements were undertaken after the City expressed an interest in buying the property. Other defense witnesses estimated the properties' fair market value at $2.4 million,[7] and replacement cost at about $1.9 million. A final defense witness, an expert appraiser and real estate market analyst from Connecticut, Dr. W.M. Kinnard, did not appraise the property but attended the entire trial and offered an oral critique of the five appraisals introduced into evidence. He felt that the appraisal with the best methodology was the one fixing the fair market value at $2.4 million.
The jury rendered a unanimous verdict fixing the total fair market value at $688,000,[8] and declining to award replacement costs. It also awarded moving expenses of $192,635 and other expenses of $175,000, for a total verdict of $1,055,635. The quantum has not been appealed.
Finally, in September 2000 the court held a hearing on the defendants' motion to complete compensation with respect to attorney fees and costs. For the taking and compensation trials, the defendants requested attorney fees of $344,048.95 and *969 costs of $150,310.77.[9] The City countered that because the jury awarded a fair market value less than the City's final offer for the property, the defendants were not entitled to attorney fees for the taking trial, citing R.S. 19:201 and Illinois Central R. Co. v. 16.032 Acres of Land in Jefferson Parish, 2000 WL 278096 (E.D.La.3/14/00). The court rejected this argument, finding it would penalize a property owner for exercising (albeit unsuccessfully) his right to contest expropriation. The court ruled the defendants were entitled to attorney fees for the entire proceedings, but found that these must be reasonable. After discussing the claims and finding many of them to be excessive or unnecessary, the court awarded attorney fees of $200,000 and costs of $51,612.88. Judgments were rendered accordingly, detailing every allowed amount.

Discussion: Power of expropriation
By their first assignment of error the defendants urge that the District Court erred in allowing the City to expropriate their property. In support they advance three arguments. First, the legislature has never expressly authorized the City to take private property for economic development or general economic benefits. Various special statutes, which might have conferred the power, are simply not applicable to this case, while the expropriation statute, R.S. 19:102, is procedural only and does not confer a power to expropriate. Second, operating a convention center, a hotel, or both cannot be a public purpose as intended by La. Const. Art. 1 § 4. Finally, this expropriation must be denied because the project entails donating public property to a private corporation for the purpose of running a hotel, in violation of La. Const. Art. 7 § 14(A).
With respect to the power to appropriate, the defendants' basic premise is stated as follows:
The City has no power or authority to take Appellants' properties for the Project or any of its component parts. The power of expropriation is strictly construed. It cannot be allowed unless it is clearly and unmistakably within the authority granted by the Constitution and the Legislature. Orig. br., 9-10.
The Constitution guarantees every person the right to "acquire, own, control, use, enjoy, protect and dispose of private property." This right is "subject to reasonable statutory restrictions and the reasonable exercise of the police power." Further, "Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit." La. Const. Art. 1, § 4.
Another provision of Art. 1, § 4 requiring "a public and necessary purpose" and making such determination "a judicial question" applies only to takings by private entities authorized by law to expropriate and is inapplicable to the instant case. Lee Hargrave, The Declaration of Rights of the Louisiana Constitution of 1974, 35 LA. L.REV. 1, 16-17 (1974).
Since expropriation proceedings derogate from the right of individuals to own property, the law governing these *970 proceedings is strictly construed against the expropriating authority. State v. Estate of Davis, 572 So.2d 39 (La.1990).
The defendants assert that in view of strict construction, the City may exercise only those powers expressly conferred by the legislature or Constitution. Kel-Kan Investment Corp. v. Village of Greenwood, 428 So.2d 401 (La.1983), and citations therein. They illustrate, with various statutes conferring a right of expropriation under special circumstances, that special authority is needed, but argue none of these applies to the instant case.[10] They even contend that R.S. 19:102 confers no right to expropriate, despite its plain statement that "any municipal corporation of Louisiana may expropriate property whenever such a course is determined to be necessary for the public interest by the governing authority of the municipality[.]"
The defendants' theory is conceptually flawed. The Supreme Court traced the history of the relationship between State and local government in Lafourche Parish Council v. Autin, 94-0985 (La.12/9/94), 648 So.2d 343, 348-349. Prior to the Constitution of 1974, the legislature maintained a "creature" political relationship with parish and municipal governments, whereby the latter could exercise only those powers specifically granted to them by the legislature. The Constitutional Convention of 1973 abrogated this awkward situation by adopting provisions for home rule charters which were ratified as La. Const. Art. 6, § 5. This section authorizes "any local governmental subdivision [to] draft, adopt, or amend a home rule charter in accordance with this Section." Adoption of a home rule charter confers general powers:
(E) Structure and Organization; Powers; Functions. A home rule charter adopted under this Section shall provide the structure and organization, powers, and functions of the government of the local governmental subdivision, which may include the exercise of any power and performance of any function necessary, requisite, or proper for the management of its affairs, not denied by general law or inconsistent with this constitution. (Emphasis added.)
Moreover, the legislature "shall enact no law the effect of which changes or affects the structure and organization or the particular redistribution of the powers and functions of any local governmental subdivision operating under a home rule charter." La. Const. Art. 6, § 6. These sections plainly show that a municipality operating under a home rule charter possesses power as broad as that exercised by the State, except where limited by the Constitution, by laws permitted by the Constitution, and the charter itself. Francis v. Morial, 455 So.2d 1168 (La.1984).
The City adopted a home rule charter, entitled Plan of Government of the City of Shreveport, on May 13, 1978. Ex. P-4. The plan provides, "Without limiting the general powers granted in this Chapter, the City shall have power: (a) To acquire and lease property and property rights within and without its boundaries for any *971 municipal purpose by purchase, gift, devise, or expropriation, and to hold, manage, control, sell, grant, lease, or donate such property or property rights in any manner for any purpose not prohibited by the Constitution or general laws of the State as may be necessary, requisite or proper[.]" Plan of Govt., § 2.03(a) (emphasis added). In short, the City has adopted a home rule charter which expressly assumes the power of expropriation.
In light of the charter, expropriation is clearly a "power given [to the City] by the state legislature * * * in attempting to expropriate defendant's property." City of Lafayette v. Delhomme Funeral Home, 413 So.2d 348 (La.App. 3 Cir.1982). For this reason, we reject the defendants' contention that R.S. 19:102 does not confer "any substantive power of expropriation." Orig. br., 12. Given the constitutional authority and the home rule charter, we find the statute specifically confers this power.
Moreover, we have closely examined the special statutes cited by the defendants.[11] They do not persuade us that special legislative authority is needed for the City to expropriate land; they all antedate the Constitution of 1974 and its more expansive concept of home rule charters. They are obviously valid within their special circumstances, but are simply irrelevant to the instant case.
For these reasons, the defendants' claim that the City lacked the power to expropriate their property is without merit.

Economic development as public purpose
The defendants next contend that the District Court erred in finding that the convention center project served a public purpose, as required by La. Const. Art. 1, § 4; while the project may promote economic development in the City, this is too broad to support a public purpose, which is the major limitation on the power of expropriation. The gist of the argument is that "if economic development is a `public purpose,' then, as a practical matter, there is no limit to the power of expropriation. * * * Because that interpretation would render the `public purpose' limitation meaningless and lead to an absurd consequence, it must be rejected." Orig. br., 19. They further ask us not to follow Town of Vidalia, supra, which holds that economic development is a public purpose, on grounds that it is overbroad. They also argue that the City has no legal right to operate a hotel, thereby negating any valid public purpose. Finally, they extensively reiterate the trial evidence and argue that, on this record, the District Court could not find that the project will really promote economic development.
Expropriation is permitted only "for public purposes and with just compensation to the owner." La. Const. Art. 1, § 4. The finding of public purpose is made by the court on the particular facts presented. Town of Vidalia, supra. A municipal corporation may expropriate only when "such a course is determined to be necessary for the public interest by the governing authority of the municipality." R.S. 19:102. The expropriating authority must show by a preponderance of the evidence a public need or interest in the expropriation. Recreation and Park Com'n v. C & S Development Inc., 97-2652 (La.7/8/98), 714 So.2d 706, and citations therein. Once the expropriating authority meets its burden with regard to public need, the burden shifts to the defendant to show that the authority has abused its discretion in selecting the site to be expropriated. Id. An expropriating authority *972 abuses its discretion when it "acts in bad faith, without adequate determining principles, or without reason." Id., citing United States v. Carmack, 329 U.S. 230, 67 S.Ct. 252, 91 L.Ed. 209 (1946). The determination of public necessity "will not be disturbed by the courts if made in good faith." Missouri Pacific R. Co., supra.
Federal jurisprudence under the public use clause of the Fifth Amendment expresses the same core concepts. In Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954), the Supreme Court held that "the role of the judiciary in determining whether that power [expropriation] is being exercised for a public purpose is an extremely narrow one." 348 U.S. at 32, 75 S.Ct. at 102. In the more recent case of Hawaii Housing Authority v. Midkiff, 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984), the Court elaborated:
There is, of course, a role for courts to play in reviewing a legislature's judgment of what constitutes a public use, even when the eminent domain power is equated with the police power. But the Court in Berman made clear that it is "an extremely narrow one." * * * The Court in Berman cited with approval the Court's decision in Old Dominion [Land] Co. v. United States, 269 U.S. 55, 66, 46 S.Ct. 39, 40 [70 L.Ed. 162] (1925), which held that deference to the legislature's "public use" determination is required "until it is shown to involve an impossibility." The Berman court also cited to United States ex rel. TVA v. Welch, 327 U.S. 546, 552, 66 S.Ct. 715, 718 [90 L.Ed. 843] (1946), which emphasized that "[a]ny departure from this judicial restraint would result in courts deciding on what is and is not a governmental function and in their invalidating legislation on the basis of their view on that question at the moment of decision, a practice which has proved impracticable in other fields." In short, the Court has made clear that it will not substitute its judgment for a legislature's judgment as to what constitutes a public use "unless the use be palpably without reasonable foundation." United States v. Gettysburg Electric R. Co., 160 U.S. 668, 680, 16 S.Ct. 427, 429 [40 L.Ed. 576] (1896).
* * *
To be sure, the Court's cases have repeatedly stated that "one person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid." * * * But where the exercise of the eminent domain power is rationally related to a conceivable public purpose, the Court has never held a compensated taking to be proscribed by the Public Use Clause. 467 U.S. at 240-241, 104 S.Ct. at 2329-2330.
In Town of Vidalia, supra, the board of aldermen sought to acquire property on a batture of the Mississippi River "for recreation and tourism purposes * * * and to promote economic growth through tourism." The project included a hotel with commercial retail center, a marina and boat ramp, and other outdoor attractions. The owners of part of the land objected on grounds that the project lacked a public purpose, urging "there must be a general public right to a definite use of the property, as distinguished from a use by a private individual or corporation which may prove beneficial or profitable to some portion of the public." The court disagreed, finding that the jurisprudence has not defined public purpose so narrowly:
Rather, any allocation to a use resulting in advantages to the public at large will suffice to constitute a public purpose. Moreover, a use of the property *973 by a private individual or corporation, when such use is merely incidental to the public use of the property by the state or its political subdivisions, does not destroy an otherwise valid public purpose. 663 So.2d at 319 (emphasis in original).
The court further found that the project would "stimulate economic growth in Concordia Parish, an area which has struggled with a poor economy and high unemployment. It is uncontradicted that the Project will contribute to the general welfare and prosperity of the community of Vidalia." In short, the Third Circuit affirmed that a project including a hotel and retail center would promote economic development, thus meeting the requirement of a public purpose and supporting expropriation.
In Board of Com'rs v. Missouri Pacific R. Co., supra, the governing board of the New Orleans Exhibition Hall Authority sought to expropriate property adjacent to its convention center on the Mississippi River. The purpose was to expand the existing convention center and truck marshaling area. The land owner, however, refused to sell the portion requested by the Board, insisting instead on selling the entire 72-acre tract. The Board successfully appropriated the partial tract. On appeal, the owner urged that the Board failed to prove a public need for the expansion. The Court of Appeal found that the Board "established that in order to fulfill its public purpose of promoting economic growth and development of the area, it is necessary to further expand the convention center." The court cited studies in evidence "which demonstrate the consistent beneficial impact of the convention center by creating new jobs and aiding the economy." In short, the court affirmed the finding of a public need and purpose for the expansion of the convention center.
Collectively, these cases provide the framework for finding that economic development, in the form of a convention center and headquarters hotel, satisfies the public purposes and public necessity requirements of Art. 1, § 4 and R.S. 19:102. We decline the defendants' invitation to disregard this jurisprudence. We also note that the legislature has declared, and courts have held, that economic development is a valid public purpose.[12]
We are cognizant of the older cases cited by the defendants for the proposition that economic development projects cannot be equated with public purpose or public benefits. See, New Orleans Land Co. v. Board of Levee Com'rs of Orleans Levee Dist., 171 La. 718, 132 So. 121 (1930); State ex rel. Porterie v. Housing Authority of New Orleans, 190 La. 710, 182 So. 725 (1938). Despite the somewhat restrictive language of those opinions, however, in Levee Board the court approved the expropriation, and in Housing Authority the court refused to declare an expropriation statute unconstitutional; it even noted that "a public purpose or public business has for its objective the promotion of the public health, safety, morals, general welfare, security, prosperity, and contentment of all the inhabitants or residents[.]" These *974 cases do not negate the rationale of Town of Vidalia and Missouri Pacific R. Co., supra.
The defendants further argue that there is no public purpose because the City has no right to own or operate a hotel. In support they cite Sugar v. City of Monroe, 108 La. 677, 32 So. 961 (1902), which is not an expropriation case but a suit to enjoin the city of Monroe from using a school building as a theater. The court stated that Monroe's city charternot introduced into evidencedid not confer the right to run a theater, and the court would not infer such a right. In the instant case, the City obviously assumed general powers by adopting a home rule charter under Art. 6, § 5, a concept that did not exist in 1902, and specifically the right to "provide for, maintain, operate * * * recreational facilities as may be necessary, requisite or proper." Plan of Govt., § 2.03(b). The court's dicta in Sugar v. City of Monroe are therefore inapposite to the instant case.
The District Court accurately summarized and carefully discussed each of the factual contentions raised by the defendants. See, Written Reasons for Judgment, R.V. 3, pp. 519-526. In this large record there was substantial evidence on which the court could find economic growth and development and, hence, public purpose and necessity. All witnesses agreed that the City's existing Expo Hall was landlocked and could not be enlarged. The Ernst & Young report predicted that a larger convention center would bring more and larger meetings to Shreveport; the PKF Consulting report confirmed this, adding that without a headquarters hotel the convention center would not succeed. Ernst & Young also projected 1,300 construction jobs with $32 million in wages, 1,300 permanent jobs with $25.6 million in annual wages, $3.5 million in annual tax revenue, and an out-of-town conventioneer who spends an average of $228.65 in town. The District Court found these reports "well documented and based on sound, reasonable premises." Michael Alost, the lead architect, testified that the three-block strip on the north side of Caddo Street was the only viable location for a project of this size, with due regard for cost, traffic management, future expansion, proximity to other attractions, and environmental concerns. This will easily support the finding that the location is necessary.
There was, of course, evidence that the proposed convention center, like centers around the country, would likely run a deficit, perhaps up to $1 million a year, at least for the first several years. There was evidence that the potential fiscal drain was de-emphasized in the bond campaign, while the glowing projections of the Ernst & Young report were heralded. There was considerable evidence that the headquarters hotel would require financial support from the City, would seldom have full occupancy, and would compete with existing hotels and motels in the area. The District Court, however, described the defendants' contentions as "interesting topics of discussion" and "not supported by the evidence; * * * unreasonably pessimistic, somewhat unprogressive, and legally without merit." On this large record, we find the City proved a public purpose.
The defendants' argument to the contrary lacks merit.

Prohibited donation of public property
The defendants next urge that expropriation must fail because the City's planned use of the hotel is a donation of public property, prohibited by La. Const. Art. 7, § 14(A). In support they cite a Louisiana Attorney General Opinion, No. 00-34 (2/29/00), advising that the City may not guarantee a portion of a private developer's *975 loan for another, unrelated City project.[13] They also urge that the City's proposed incentives to attract a hotel developer are tantamount to the municipal risk-sharing scheme that was declared unconstitutional in City of Port Allen v. Louisiana Municipal Risk Mgt. Agency, 439 So.2d 399 (La.1983).
The basic prohibition against the donation of public property, Const. Art. 7, § 14(A), states:
(A) Prohibited Uses. Except as otherwise provided by this constitution, the funds, credit, property, or things of value of the state or of any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private. Neither the state nor a political subdivision shall subscribe to or purchase the stock of a corporation or association or for any private enterprise.
Certain exceptions are contained in Section 14(B), which the parties concede do not apply to the instant case. The City, however, urges that its incentives, when formulated, will be permissible under Section 14(C):
(C) Cooperative Endeavors. For a public purpose, the state and its political subdivisions or political corporations may engage in cooperative endeavors with each other, with the United States or its agencies, or with any public or private association, corporation, or individual.

(Emphasis added.)
The question whether a grant or payment is for a public purpose is "left to the judiciary so that there is sufficient flexibility for a lasting and workable document." Lee Hargrave, The Work of the La. Appellate Courts for the 1975-1976 Term: Constitutional Law, 37 LA. L.REV. 480, 486, and citations therein. Section 14(C) had no counterpart in the prior constitution; it "liberalizes" the rule of Section 14(A) which "if strictly construed would prevent much of what a modern state is expected to do for its citizens." Id.
The Ernst & Young report suggested that substantial public subsidies may be needed from the City; Mr. Alost admitted that financial incentives were a "probability," and a memo from SAM to the mayor suggested that the incentive package would be $5-7 million. A request for proposals, distributed to hotel operators in December 1999, indicated the City would make the land for the hotel available without cost to the developer. However, Mr. Keeling of PKF Consulting testified that making the land available free of cost would not attract a developer; he described, in some detail, public-private ventures to "enhance financibility," including tax regulation and cost sharing. He added that public-private ventures had succeeded in Wichita, Kansas and Norfolk, Virginia. Mayor Hightower testified that the City had not yet entered a cooperative endeavor agreement with any hotel operator. On this evidence, the District Court was entitled to find that the exact incentives "remain undetermined." The record does not support the defendants' contention that the City will donate expropriated land to any hotel developer. City of Port Allen and the Attorney General Opinion are thus distinguished.
As noted earlier, once the public purpose has been established, the fact that a private entity may develop and profit from the project does not negate its public nature. *976 Town of Vidalia v. Unopened Succession of Ruffin, supra; State ex rel. Porterie v. Housing Authority, supra; Hawaii Housing Authority v. Midkiff, supra. Similarly, the fact that a private developer may build or operate the hotel does not violate Art. 7, § 14.
For these reasons, the judgment of expropriation will be affirmed.

Attorney fees
By their second assignment of error, the defendants urge the District Court failed to award reasonable attorney fees and costs incurred in defending the expropriation suits. By answer to appeal, the City also contests the award of attorney fees and costs as legally erroneous or excessive. We will consider the attorney fees first.
The defendants claim that attorney fees for both phases of the trial are mandated by La. Const. Art. 1, § 4's guarantee of compensation "to the full extent of his loss." They also cite R.S. 19:109 A, which provides in part:
Immediately after compensation has been determined, the plaintiff shall, upon motion of the defendant, present evidence as to the highest amount it offered defendant for the property prior to trial on the merits. After hearing evidence on the issue, the court shall determine the highest amount offered. If the highest amount offered is less than the compensation awarded, the court may award reasonable attorney fees.
The defendants demand attorney fees of $344,000, the full amount invoiced by their various attorneys, plus additional fees for the appeal.[14] The District Court awarded $200,000 for all attorney fees.
The City urges the court committed legal error by awarding any attorney fees. As it prevailed in the taking trial, the City argues it should not have to pay the losing party's legal fees. In support it cites Illinois Central R. Co. v. 16.032 Acres of Land, supra; City of Lafayette v. Delhomme, 401 So.2d 1044 (La.App. 3 Cir.1981); City of New Orleans v. Condon, 600 So.2d 78 (La.App. 4 Cir.), writ denied 605 So.2d 1130 (1992); and R.S. 19:201. It further contends that before the compensation trial, it made all efforts to negotiate a fair price with the defendants; ultimately, the jury awarded a fair market value less than the City's final offer, and a total award of only $207,635 more than the final offer. Given its good faith effort to avoid litigation and the small margin of the verdict, the City urges that any award of attorney fees is an abuse of discretion. If any fees are warranted, the City suggests the measure of R.S. 48:453 E, or 25% of the difference.[15]
*977 In Illinois Central, the plaintiff, a railroad company, sued to expropriate 16 acres; according to the opinion, "the parties agreed to have this Court try the issue of expropriation on a written record." The judge found the railroad was entitled to appropriate the land, and ordered a jury trial on compensation. Prior to trial, the railroad offered the defendant $2 million; the jury awarded $2.9 million. The defendant then filed a motion for attorney fees, including those incurred in the taking trial. The federal judge noted that under the statute,[16] "the trial court may award reasonable attorney fees if the highest amount offered by [sic ] the landowner is less than the amount awarded by the jury." However,
It does not provide that, if the landowner wins the expropriation phase of the trial, he may recover fees. The statute only mentions attorneys fees after it discusses the compensation phase and the sentence providing for fees specifically discusses only the issue of compensation. Thus, the statute's plain language indicates that it was designed to reward persons who claim that they have not been offered the fair market value of their land and prevail, rather than to enrich those who contest an expropriation of their land and lose.

(Emphasis added.)
The court analogized the defendant's claim to those in civil rights cases, in which only the "prevailing" party may recover attorney fees,[17] concluding that the statute "was not designed to reward landowners for issues on which they failed to prevail." The court declined to follow Louisiana Resources Co. v. Greene, 406 So.2d 1360 (La.App. 3 Cir.1981), writ denied 412 So.2d 84 (1982), which held the opposite: it rejected the theory that if the landowner lost the taking trial, he could win attorney fees only for the compensation trial. The Federal Court therefore refused to award attorney fees for the taking trial.
We have closely examined Illinois Central and find it unpersuasive. Its reading of R.S. 19:8 is strained. The statute reads, "If the highest amount offered is less than the compensation awarded, the court may award reasonable attorney fees"; this is not modified by a limiting clause such as "for the compensation trial only." The rule of strict construction against the expropriating authority, State v. Estate of Davis, supra, prohibits engrafting such a proviso onto a plainly written statute. The Greene court specifically recognized "the right of landowners to test the right of an agency authorized to expropriate generally under Title 19 * * * to (1) expropriate in a specific case and (2) to have its day in court on the issue of compensation." 406 So.2d at 1371 (emphasis added). Notably, Greene, supra, City of Shreveport v. Pupillo, 390 So.2d 941 (La.App. 2 Cir.1980), writ denied 396 So.2d 921 (1981), and City of New Orleans v. Condon, supra, all affirmed attorney fees to defendants who lost their taking trials.
Furthermore, the trial in Illinois Central was "on a written record," which might equitably warrant denying attorney fees, but the same simply cannot be said about the five-day taking trial herein. We therefore decline to follow Illinois Central, and affirm attorney fees as an element of compensation for "the fundamental right of landowners to test an expropriation on all points or issues which may arise." *978 Louisiana Resources Co. v. Greene, 406 So.2d at 1371.
The City also argues that R.S. 19:201 defeats the defendants' claim for attorney fees. This statute provides that the court shall award the landowner "such sum as will, in the opinion of the court, reimburse such owner for his reasonable attorney fees actually incurred because of the expropriation proceeding," if the expropriation claim is rejected or abandoned. Prentice Oil & Gas Co. v. State, 421 So.2d 937 (La.App. 1 Cir.), writ denied 423 So.2d 1165 (1982). The statute does not, however, state the contrary; viz., it does not state that if the municipality obtains a judgment of expropriation, no attorney fees are due the owner. The City's suggestion to interpret it that way lacks merit. The defendants are entitled to reasonable attorney fees in accord with R.S. 19:109.
The amount of attorney fees in expropriation cases is discretionary with the trial court. State v. Estate of Davis, 572 So.2d at 45. Relevant factors include the ultimate result obtained, the responsibility incurred, the importance of the litigation, the amount of money involved, the extent and character of the work performed, legal knowledge, attainment and skill of the attorneys, number of appearances, intricacies of the facts involved, diligence and skill of counsel, and the court's own knowledge. State v. Williamson, 597 So.2d 439 (La.1992), and citations therein. The court is not bound by a contingency fee contract or the amount actually charged by the attorney. Taylor v. Production Serv. Inc., 600 So.2d 63 (La.1992); Norris v. Goeders, 26,130 (La.App. 2 Cir. 3/10/95), 652 So.2d 144. The trial court's discretion is great and will not be disturbed in the absence of a clear abuse of that discretion. Red River Waterway Com'n v. Fry, 628 So.2d 38 (La.App. 2 Cir.1993), writ denied 93-3050 (La.2/4/94), 633 So.2d 581.
The District Court commented that there were significant, novel issues in the compensation trial, but that one defendant, Hollenshead, "sought to get a windfall from the City in this matter." The court observed:
At one point early on he had all these properties listed for a certain amount of money, and then as there appeared to be a trend by the City in terms of beginning to focus on this area and specifically perhaps his properties, all of a sudden, the property was not listed anymore, the prices went up and then, all of a sudden, they weren't on the market, and then it seems that negotiations began which were ultimately, of course, fruitless. And then there was battle in the courtroom.
As this protracted two-part trial resulted in a net gain to the defendants of only $207,000 more than the City's final offer, the claimed fees of $344,000 are apparently excessive. The court also noted that defense counsel went on some "wild goose chases," a point which can hardly be disputed. At trial the defendants spent much time and effort attempting to prove that the convention center is not a good idea, instead of focusing on public purposes. The final verdict in the taking trial was large, over $1 million, but still less than half of the value asserted by the defense.
Under the circumstances, we cannot say the District Court committed error in awarding slightly over half of the claimed attorney fees. The award is neither inadequate nor excessive. It will be affirmed.

Costs
Both sides challenge the award of costs. The defendants urge the District Court erred in denying costs (and attorney *979 fees) for a mock trial held in preparation for the compensation trial. The City denies any expert witness fees are due because the jury flatly rejected the defense appraisals.
Unless the judgment provides otherwise, costs shall be paid by the party cast. Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, as it may consider equitable. La. C.C.P. art. 1920. The court has great discretion in fixing costs. Cajun Elec. Power Co-Op. v. Owens-Corning Fiberglass Corp., 616 So.2d 645 (La. 1993). The defendant can have taxed as costs the reasonable cost of time spent by experts in gathering facts necessary for his testimony but not for time spent in consultation which only assists the attorney in preparing for litigation. State v. United Pentecostal Church of Hodge, 313 So.2d 886 (La.App. 2 Cir.), writ denied 318 So.2d 60 (1975), cert. denied 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975); Albin v. Illinois Central Gulf R. Co., 607 So.2d 844 (La.App. 1 Cir.1992).
The cost of a mock trial was apparently allowed in Edmundson Bros. Partnership v. Montex Drilling Co., 98-1564 (La.App. 3 Cir. 5/5/99), 731 So.2d 1049. Federal courts have held that mock trial costs are recoverable if they are not excessive and they confer a benefit to the prevailing party by helping to produce a favorable result. Charles v. Daley, 846 F.2d 1057 (7 Cir.1988); United Steelworkers of Amer. v. Phelps Dodge Corp., 896 F.2d 403, 114 Lab. Cas. ¶ 56,173 (9 Cir.1990); Sigley v. Kuhn, 2000 WL 145187 (6 Cir. 1/31/00) (unpublished op.). These cases, however, caution against "supererogation," or excessive preparation. Here, the District Court viewed the mock trial and jury consultant as overhead items which cannot be reimbursed. Given that these exercises were strictly to aid the attorneys and yielded only marginal results, we cannot say the District Court abused its great discretion in denying these items as costs.
Witnesses called to testify as experts shall be compensated for their services, with the amount to be determined by the court and taxed as costs to be paid by the party cast in judgment. La. R.S. 13:3666; Hammock ex rel. Thompson v. Louisiana State Univ. Med. Center, 34,086 (La.App. 2 Cir. 11/1/00), 772 So.2d 306, and citations therein. An expert witness is entitled to reasonable compensation for his court appearance and for his preparatory work. Id. The court is not required to award the amount charged by the witness. Stonecipher v. Mitchell, 26,575 (La.App. 2 Cir. 5/10/95), 655 So.2d 1381. Relevant factors in fixing the fee include the time spent testifying, time spent in preparation for trial, time spent away from regular duties while waiting to testify, extent and nature of the work performed, and the knowledge, attainments of the expert. Id. The court may also consider the helpfulness of the expert's report and testimony. Id.
The District Court awarded costs for five defense experts, some for much less than the amount claimed.[18] While the jury did not accept the defendants' elevated appraisals, it obviously utilized them in rendering a total verdict higher than the City's estimates or offers. The District Court's judgment strikes a reasonable balance between professional effort expended and the utility of the real estate appraisals. On this record, the expert witness fees are not an abuse of discretion.
*980 Finally, the defendants requests additional attorney fees for the appeal. They initiated an appeal which was unsuccessful, so additional fees are not warranted. See, Caparotti v. Shreveport Pirates Football Club, 33,570 (La.App. 2 Cir. 8/23/00), 768 So.2d 186, writ denied 00-2947 (La.12/15/00), 777 So.2d 1230.

Conclusion
For the reasons expressed, the judgments are AFFIRMED. Appellate costs are assessed 50% to the defendants, Harold H. Hollenshead and Chanse Gas Corp.; the other 50% is not assessed. La. R.S. 13:4521.
AFFIRMED.
CARAWAY, J., concurring in part and dissenting in part, with written reasons.
CARAWAY, J., concurring in part and dissenting in part.
I agree with much of the majority's extensive analysis of the law regarding a home rule chartered municipality's power to expropriate and the issue of public purpose. However, I can only concur in the conclusion that the taking was appropriate in this case because I find that the majority's application of the law suggests that the trial court, as fact-finder in this case, could have vetoed the action of the elected legislative body had it accepted the defendants' evidence that economic growth and development will not result from the proposed convention center and hotel and that the economic drain on the City's revenues will be to the public's detriment.
Initially, the defendants' contention that the City can have nothing to do with a hotel should be further addressed. To answer this contention, I would expand upon the majority's conclusion that Article 6, Sections 5 and 6 of the constitution "plainly show that a municipality operating under a home rule charter possesses power as broad as that exercised by the State." The State's power of expropriation to carry out a project in the public interest should be as broad as the plenary power of the people of the State, exercised through the legislature. Our supreme court has stated that "[i]n its exercise of the entire legislative power of the state, the legislature may enact any legislation that the state constitution does not prohibit." Board of Commissioners of Orleans Levee District v. Department of Natural Resources, 496 So.2d 281, 286 (La.1986). A portion of that same legislative power of the State under the constitution's framework for home rule local governmental subdivisions is delegated to the City pursuant to Article 6, Section 5(E) for anything "necessary, requisite or proper for the management of its affairs, not denied by general law or inconsistent with this constitution." No state statute (general law) nor the constitution prohibits the City, through its legislative process as a home rule entity, from deciding that a convention center with a hotel to facilitate that convention center is necessary for the welfare of the City.
With this broad legislative power of the State or City defined, the judiciary's role to prevent a decision to expropriate is limited. Nevertheless, the majority first makes an overly broad statement of law that "the finding of public purpose is made by the court on the particular facts presented," and then concludes that "in this large record there was substantial evidence on which the court could find economic growth and development and, hence, public purpose and necessity." First, from the language of Article I, Section 4 of our constitution, there is the clear implication that the issue of "whether the purpose is public and necessary" is precluded from judicial review as a "judicial question" and is instead a legislative decision for any *981 expropriation proposed for the benefit of the State or political subdivision. Next, under the majority's analysis, with future economic projections in play as a relevant fact inquiry, the majority would have been hard pressed under the manifest error standard of appellate review to overrule the trial court had the trial court accepted the testimony of the defendants' economic experts that the City Council's decision for the convention center will result in a governmental boondoggle.
Future economic projections and any other policy considerations weighed by the City Council were not relevant facts for consideration in the five-day taking trial in this case. On the face of the pleadings and admitted by both sides are the facts that (i) the City Council voted for this project, (ii) the public at large approved a bond issue for the convention center, (iii) other significant businesses and tracts of land surrounding the defendants' property will be acquired by the City, and most importantly, (iv) the project is for a convention center which, like a park or public building, is intended for the obvious purpose of entertaining, educating and serving the public. Those basic facts represent a prima facie case of public purpose. In the face of such evidence, a defendant in an expropriation trial may only challenge the taking of his property by showing that no such project is in fact intended to be carried out so that his property has been singled out arbitrarily to be acquired by a governmental body under some other rare motive exercised in bad faith that is not rationally related to any conceivable public purpose. While the defense at trial presented a sufficient case challenging the wisdom of the City Council's decision, which an elected representative on that council might have argued to defeat the project, nothing in the five-day taking trial was presented to show that the defendants have been singled out arbitrarily to be put out of business for a project that the City has no intention of attempting. Only such evidence of abusive use of the taking power is relevant. As the United States Supreme Court has stated "[w]hen the legislature has spoken, the public interest has been declared in terms well-nigh conclusive. In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served...." Berman v. Parker, 348 U.S. 26, 32, 75 S.Ct. 98, 99 L.Ed. 27 (1954).
While the above view of the power of expropriation may at first glance appear too powerful and unstoppable, my view of the framework of our government is that legislative boondoggles may be changed and prevented through collective participation in elective government and the political process. Most important to the present defendants, under the Bill of Rights and our constitutions, the individual's protection from governmental intrusion, which courts must insure, is not afforded by second guessing the legislative body but by just compensation for the expropriated property.
In summary, the minimal level of scrutiny which a court must apply to a legislative determination of the public interest causes much, if not all, of the defense evidence presented during the five-day taking trial to be irrelevant. I do not agree that the trial court could have accepted the economic projections of the defendants' experts and determined that the City Council's decision for the convention center did not justify the taking of the property. Therefore, I concur in the ruling regarding the propriety of the expropriation. Furthermore, because I believe the "taking trial" raised no defense against the expropriation, I dissent to the $200,000 award for attorney's fees determined from the legal services rendered in both phases *982 of the case and would reduce the award considerably.
NOTES
[1] A third owner, Allright Parking Systems, was named defendant in one of the suits. It elected "not to contest" the proceedings, however, so only Chanse and Hollenshead litigated the case as defendants.
[2] Several members of Mayor Williams's committee were appointed to the second committee.
[3] The measure passed by a margin of 78% for, 22% against. See, www.sec.state.la.us/cgibin/ ?rqsdtyp=ELCMR & rqsdta=071799 & ID=99922243.
[4] Team members included Hellmuth, Obata & Kassabaum, an international architecture firm; Morlok Development Group, a real estate developer from Philadelphia; and PKF Consulting, a hospitality or leisure real estate consultant from Houston.
[5] The offer was as follows: Chanse's office building, $250,000; Chanse and Hollenshead's warehouse and parking lot, $310,000 and $190,000 respectively.
[6] According to the argument of counsel, on the eve of the compensation trial, the City offered the defendants $848,000 for the three tracts. R.V. 14, pp. 4-5.
[7] Oren Russell, a real estate appraiser and consultant from Baton Rouge, appraised Chanse's office at $430,000, and Chanse and Hollenshead's warehouse and parking lot (together) at $2,010,000.
[8] Fair market value for Chanse's office building was $210,000; and for Chanse and Hollenshead's warehouse and parking lot, $190,000 and $288,000 respectively.
[9] For the compensation trial alone, the defendants claimed attorney fees of $186,854.50 and costs of $106,785.45. Costs included filing fees, court reporter fees, expert deponent fees, and copying expenses; airfare, taxi service, lodging and meals for defendants' lead counsel, Darrell K. Cherry, who commuted from New Orleans for the trial; hotel and lodging for other expert witnesses; and "other litigation expenses," including office supplies, Lexis-Nexis fees, a jury consultant and the costs of conducting a mock trial on the compensation issue.
[10] These include La. R.S. 33:4621 (authorizes municipalities to acquire property "for any of the purposes for which they are organized"); R.S. 33:4671 (authorizes municipalities with a population over 25,000 acquire property for a "municipal auditorium or convention hall" and finance it by the sale of bonds); R.S. 39:553 (authorizes municipalities to issue bonds for enumerated public purposes); R.S. 33:4625 B and H (authorizes expropriation to abate "slum and blighted" property under Parish Redevelopment Law); La. Acts 1968, No. 179 (authorizes City of Shreveport to expropriate property to abate "slum and blighted" areas).
[11] See fn. 10, supra.
[12] See, La. R.S. 33:9021(4) ("The maintenance of the economy of the several local governmental subdivisions of the state at a high level is a matter of public policy and the cooperative economic development activities * * * are for a public purpose for which public money may be expended"); R.S. 33:9021(5) ("the maintenance of the economies of said local political subdivisions at a high level is found and declared to be a public purpose"); Polk v. Edwards, 626 So.2d 1128 (La.1993) ("The legislature specifically stated that the Casino Act is `for a public purpose' to improve the Louisiana economy, improve tourism, and enrich the public fisc").
[13] The Red River Entertainment District, also called Shreve Square, is approximately seven blocks from the Convention Center site.
[14] Although the award was a lump sum, the defendants contest various specifics. Darrell Cherry, of the New Orleans firm of Deutsch, Kerrigan & Stiles, represented the defendants at the compensation trial at a rate of $225 an hour; the District Court found this was excessive by Shreveport standards. The court questioned awarding Billy Pesnell, lead counsel for the taking trial, his normal $175 an hour fee for the compensation trial, in which he was co-counsel with Mr. Cherry. The court also "minimized" a fee of $2,692.95 claimed by New Orleans firm Barham & Arceneaux for preparing a writ application on certain pretrial rulings; no writs were actually filed.
[15] For expropriation by the Department of Transportation and Development for roads, bridges and ferries, R.S. 48:453 E states: "Reasonable attorney fees may be awarded by the court if the amount of the compensation deposited in the registry of the court is less than the amount of compensation awarded in the judgment. Such attorney fees in no event shall exceed twenty-five percent of the difference between the award and the amount deposited in the registry of the court."
[16] The Federal District Court cited R.S. 19:8, a general provisions statute which is identical to R.S. 19:109, a special statute for expropriation by municipalities.
[17] 42 U.S.C. § 1988; Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).
[18] The witnesses were Elmo W. Bryant, $2,000 (amount claimed was $3,055); J. Jon Fels, $5,000 (claimed $11,295); George McInnis, $2,500 (claimed $2,500); Oren Russell, $7,500 (claimed $35,009); and William Kinnard, $7,500 (claimed $30,421.72).