907 So.2d 904 (2005)
ALLSTATE ENTERPRISES, INC., Plaintiff-Appellant
v.
Greg BROWN and Denise Brown, Defendants-Appellants.
No. 39,467-CA.
Court of Appeal of Louisiana, Second Circuit.
June 29, 2005.
*908 Kenneth L. Harper, for Allstate Enterprises, Inc.
C. Bryan Racer, Monroe, for Greg Brown and Denise Brown.
Before CARAWAY, BROWN and STEWART, JJ.
CARAWAY, J.
This is a dispute between homeowners, who directed the construction of their home based on plans obtained from the internet, and the framing contractor which they hired. The contractor filed a lien for the balance owed on the parties' contract and the homeowners reconvened for damages related to the contractor's alleged substandard work. The trial court ruled in favor of the homeowners regarding the defective work, awarded damages in excess of the total contract price, and denied the contractor's claim of offset for the unpaid balance. Finding that the trial court erred in its failure to apply the doctrine of substantial performance of the contract, we reverse the ruling to allow the offset and to adjust the excessive award for damages to the homeowners.

Facts
Greg and Denise Brown obtained the services of Allstate Enterprises, Inc. ("Allstate") to furnish labor for a portion of the construction of a new home. Allstate first sued the Browns for $10,552.00, the unpaid balance on the contract, and the Browns reconvened for alleged damages resulting from Allstate's substandard workmanship.
After obtaining architectural plans for the home off the internet, Mr. Brown contacted Bill Thompson at Allstate to frame the foundation, pour the slab and frame up the house. The framing work included the roof, outside doors, windows, all walls and stairs. Brown testified that he "subcontracted" with other contractors, including electricians, plumbers, and a sheet rock subcontractor. Brown did some of the finishing work like interior painting.
The Browns' house design, Chatham Plan No. 4254-A-1, called for construction of an elaborate two-story, five-bedroom and three-bath stucco house with 4249 square feet of living area, 802 square feet of porches and an 816 square foot detached garage. The plans called for ten-foot ceilings on the first floor and nine foot ceilings on the second floor, along with an upstairs balcony traversing the family and dining room areas. The first floor architectural details included numerous archways and columns.
With regard to care and accuracy of these architectural designs, the plans expressed the following limitations:
Great care and effort have gone into the creation of the design of these plans. However, because of the impossibility of providing any personal and/or "on-the-site" consultation and supervision over the actual construction, and because of the great variance in local building code requirements, and other local building and weather conditions, designer assumes no responsibility for any damages, including structural failures, due to any deficiencies, omissions or errors in the design, blueprints, or specifications.
Thompson studied the plans and prepared the following proposal which was accepted by the Browns:
We hereby submit specifications and estimates for: House approximately 4691 sq. ft. on slab. Second story contains 1236 sq. ft. Total of 5927 sq. ft. Form, set, & dig footings install rods, wire, Visqueen Framing to include Studwalls, ceiling joists, rafters, decking, felt, cornice (soffit), set outside doors and windows. Cornice not to include crown mold per owners instructions and front *909 doors square fit. Outside of Home to be vinyl siding instead of stucco. Slab normal one foot above ground.
Bid Exclusions: No materials, electrical, plumbing, A/C & Htg
Raised Slab of 30 inches above ground will be cost plus 8% Approximately $2,605.83 for the slab. Total approx. $39,742.24
We propose hereby to furnish labor only  complete in accordance with the above specifications for the sum of $37,136.41 with payments to be made as follows: 4 payments: 1st¼ 2nd¼ 3rd¼ 4th¼
Greg Brown arranged to furnish all construction lumber and materials using a list based on the plans prepared by Tom Sanders, a lumber supplier. Although Sanders compiled the list, Brown shopped it with others and ultimately contracted for building materials with Russell Moore. Moore delivered the construction materials to the site as needed, based on Sanders' list.
The Browns alleged that Allstate's work on the house deviated from the plans and constituted substandard workmanship in numerous areas. The house foundation was apparently overshot by 3". This led to the dormers, windows, doors and dining room chandelier being off center. Allstate's carpenter, Randy Dodson, admitted that he missed 1½" on each end of the form when he set it, which caused the front porch to be 3" short. To remedy this situation, Thompson suggested a 3" double-studded wall on the left hand side of the interior of the house. Denise Brown authorized construction of the double wall. Dodson testified that alternatively, a concrete saw could have been used to remove the excess 3" from the foundation.
The height of the upstairs exterior walls deviated from the plans. The highest exterior second floor wall measures 41" high, which makes use of the upstairs walk-in closets difficult. The plans called for the walls to be no less than 66" high. The deviation was apparently attributable to either a design defect in the plans, a discrepancy in the pitch of the roof, or simply the location of the walls in the upstairs rooms. Brown's construction expert, John Maroney, testified that the problem with the short upstairs walls occurred because Thompson did not draw framing plans prior to starting construction.
The house plans called for 2×8 rafters for the roof. Tom Sander's list called for 2×6 rafters, and Moore delivered 2×6 rafters for use in the house construction. In Thompson's opinion, 2×6's were adequate if they were supported properly and braced off. Dodson testified that "just about every house you build is going to have 2×6 rafters." Maroney testified that although the roof of the house sagged, and the 2×8 rafters would have been stronger, he could not specifically attribute the sagging problem to the difference between the size of the rafters.
Greg Brown testified that after they started hanging sheetrock, he noticed the center dormer was 9" off center to the left, and the dining room chandelier was also off center. The plumber told Brown that the foundation was poured 3" off. Brown stated that "it throwed the whole front of the house off." The dining room chandelier was moved over 9" from the center of the room to improve aesthetics.
The garage floor elevation was lower than the house foundation. Brown testified that rainwater runs through the garage and out the garage door. Although Brown hauled some fill dirt in, he said Thompson was supposed to have formed it, backfilled it and reshot the grade before pouring the concrete. Thompson testified that there was a separate contract between Allstate and Brown to fill the foundation in with dirt after it was framed. *910 However, when Thompson started the job late, Brown told him to go ahead, that the pad was ready and the dirt work had been finished. Maroney testified that the garage elevation should have been about one foot higher. Also, the concrete in the breezeway between the garage and the house was cracked. Brown asserted that this problem was due to the lack of expansion joints, as called for in the plans.
The living room columns and archways were not finished properly according to Brown. Thompson testified that he worked on the columns himself and that they were straight.
The height of the living room staircase risers varied, and the garage staircase steps were too steep and too narrow. When Thompson and Dodson laid out the garage steps according to the plans, they advised Brown that the stairs were not wide enough to properly accommodate one's foot and recommended 1½" be added to each step. In order to obtain these wider steps, they advised Brown to add a turn of the staircase into the garage. After discussing the problem, Brown told them to make the steps straight according to the plans. Brown testified that he didn't notice the problems with the stairs until the finishing work began.
Maroney estimated, among other items, that it would cost $6,000 to repair the two staircases, $500 to repair the walls in the master bedroom, $1,000 to fix a closet which was out of square and $60,000 to remove and raise the roof to remedy the wall height problem in the second story. The balance owed Allstate under this contract was $10,552.41.
Following a bench trial reviewing all the above matters, the trial court issued written reasons for judgment, specifically ruling that "this house was built below the standard of reasonable workmanship in too many particulars to name within this ruling." This initial ruling went on to recognize an unspecified amount of damages "not to exceed the cost of making comprehensive repairs...." Despite evidence of the Browns' damages presented at trial, the Browns were nevertheless invited "to file a Rule to establish and/or set the amount reasonably necessary to make the comprehensive repairs in question." After initial appeals of this partial and incomplete judgment by the trial court, this court remanded the case. Without any further evidentiary hearing, the trial court then rendered a money judgment in favor of the Browns. The court's written reasons concerning quantum were expressed as follows:
Pursuant to this Court's initial ruling and the directives of the 2nd Circuit, and considering this Court's Order dated 4 November 2004, and considering the offering made pursuant to same, damages are awarded to the prevailing party in the amount of $55,000.00 as reasonable cost of repair in order to address the many problems previously referenced (including-but not limited to-the roof, the garage stairs, the principle stairs, etc.). Expert witness fees of $2800 shall be taxed as cost against the losing party. Brown's request for attorney fees is denied. Allstate's request for "offset" is denied.
It is from this judgment that the parties appeal.

Discussion

I.
The first issue argued by both parties concerns the application of the New Home Warranty Act ("NHWA"), La. R.S. 9:3141, et seq. Specifically, the Browns have appealed seeking attorney fees provided to the owner of a home for breach of the warranties under the NHWA, pursuant to La. R.S. 9:3149. Allstate contends *911 that its role as a contractor for only a portion of the total construction of the home does not make it a "builder" under the act. The provisions pertinent for the answer of this issue are as follows:
§ 3141  The legislature finds a need to promote commerce in Louisiana by providing clear, concise, and mandatory warranties for the purchasers and occupants of new homes in Louisiana and by providing for the use of homeowners' insurance as additional protection for the public against defects in the construction of new homes. This need can be met by providing a warranty for a new home purchaser defining the responsibility of the builder to that purchaser and subsequent purchasers during the warranty periods provided herein. The warranty, which is mandatory in most cases, shall apply whether or not building code regulations are in effect in the location of the structure, thereby promoting uniformity of defined building standards. Additionally, all provisions of this Chapter shall apply to any defect although there is no building standard directly regulating the defective workmanship or materials.
§ 3143(1)  "Builder" means any person, corporation, partnership, limited liability company, joint venture, or other entity which constructs a home, or addition thereto, including a home occupied initially by its builder as his residence. A person, corporation, partnership, limited liability company, joint venture, or other entity which constructs a home, or any addition thereto, is a "builder", whether or not the consumer purchased the underlying real estate with the home.
* * *
(3) "Home" means any new structure designed and used only for residential use, together with all attached and unattached structures, constructed by the builder whether or not the land was purchased from the builder. Such term includes structures containing multiple family dwellings or residences.
(4) "Initial purchaser" means any person for whom a home is built or the first person to whom a home is sold upon completion of construction.
* * *
(6) "Owner" means the initial purchaser of a home and any of his successors in title, heirs, invitees, or assigns to a home during the time the warranties provided under this Chapter are in effect.
§ 3144(A)  Subject to the exclusions provided in Subsection B of this Section, every builder warrants the following to the owner:
(1) One year following the warranty commencement date, the home will be free from any defect due to noncompliance with the building standards or due to other defects in materials or workmanship not regulated by building standards.
(2) Two years following the warranty commencement date, the plumbing, electrical, heating, cooling, and ventilating systems exclusive of any appliance, fixture, and equipment will be free from any defect due to noncompliance with the building standards or due to other defects in materials or workmanship not regulated by building standards.
(3) Five years following the warranty commencement date, the home will be free from major structural defects due to noncompliance with the building standards or due to other defects in materials or workmanship not regulated by building standards.

*912 § 3149(A)  If a builder violates this Chapter by failing to perform as required by the warranties provided in this Chapter, any affected owner shall have a cause of action against the builder for actual damages, including attorney fees and court costs, arising out of the violation. The damages with respect to a single defect shall not exceed the reasonable cost of repair or replacement necessary to cure the defect, and damages with respect to all defects in the home shall not exceed the original purchase price of the home.
While the trial court indicated in its initial ruling on liability that the NHWA applied, it later denied an award of attorney's fees which would be clearly owed to the Browns under its ruling for damages if the act applied. Additionally, we note that the $55,000 award for damages did in fact exceed the $37,000 price for Allstate's work under the parties' contract, which would presumably be in violation of the last sentence of § 3149(A) if the $37,000 amount is considered "the original purchase price of the home" within the meaning of the act. From our review of the above provisions of the NHWA, we find that the act does not apply to this dispute for the following reasons.
Allstate was only a contractor for part of the work on the home. It did not draw up the plans for the home nor monitor every aspect of the work on the home through its own employees or subcontractors. Cf., La. R.S. 9:2771 discussed below. The dirt work on the pad, the plumbing, electrical, insulation, sheetrocking, duct, heating, cooling and painting jobs, were all carried out by other parties. Each of these subcontractors who dealt directly with the Browns might therefore, like Allstate, be considered a builder under the NHWA if the act may be so broadly construed. We do not interpret the act in that manner.
The central definition of the NHWA is for the "home," which is "any new structure designed and used only for residential use ... constructed by the builder." That definition, when read as involving the whole structure built by a single builder, then supports the imposition of the warranties under Section 3144(A) of the act which are aimed at a single builder for the entire structure. We have already noted Section 3149's use of the concept of the "original purchase price of the home" as a limitation on the amount of damages owed under the act. Although the combined definitions for the terms "initial purchaser" and "owner" do not require the sale of the home by the builder to the owner, and allow protection for persons like the Browns "for whom the home is built," Allstate did not build a functional, completed home for the Browns. Accordingly, from the definition of "home" set forth in the act and its overall purpose as stated by the legislature in Section 3141, we do not find that the NHWA was intended to have a scope applicable to a contractor that did not construct the entire structure and deliver it to the Browns as their new home. The trial court's ruling denying the Browns' attorney's fees is affirmed.

II.
Implicit in every building contract is the requirement that the work shall be performed in a good, workmanlike manner, free from defects in material and workmanship. Davidge v. H & H Construction Co., 432 So.2d 393 (La.App. 1st Cir.1983). The contractor is liable for failure to perform properly. La. C.C. art. 2769; Davidge, supra.
Nevertheless, under the Louisiana jurisprudence, a building contractor is entitled to recover the contract price even though defects and omissions are present *913 after he has substantially performed the building contract. "Substantial performance" means that the construction is fit for the purposes intended despite the deficiencies. Airco Refrigeration Service, Inc. v. Fink, 242 La. 73, 134 So.2d 880 (1961); Mayeux v. McInnis, 00-1540 (La.App. 1st Cir.9/28/01), 809 So.2d 310, writ denied, 01-3286 (La.3/8/02), 810 So.2d 1164; Industrial Roofing & Sheet Metal Works, Inc. v. J.C. Dellinger Memorial Trust, 32,048 (La.App. 2d Cir.8/20/99), 751 So.2d 928, writ denied, 99-2948 (La.9/16/99), 752 So.2d 166; Salard v. Jim Walter Homes, Inc., 563 So.2d 1327 (La.App. 3d Cir.1990); Neel v. O'Quinn, 313 So.2d 286 (La.App. 3d Cir.1975), writ denied, 319 So.2d 440 (La.1975). For a court to refuse dissolution of the contract, the contractor must have rendered a substantial part of the performance and the unperformed part of the obligation must not impair the interest of the obligee. La. C.C. art. 2014 and its Revision Comments. Among the factors to be considered for substantial performance include the extent of the defect or non-performance, the degree to which the purpose of the contract is defeated, the ease of correction and the use or benefit to the owner of the work performed. Airco Refrigeration Service, Inc. v. Fink, supra; Salard v. Jim Walter Homes, Inc., supra.; Riche v. Juban Lumber Co., 421 So.2d 318 (La.App. 1st Cir.1982); Neel v. O'Quinn, supra. Once substantial performance has been shown, the burden of proof shifts to the owner who must prove the existence and nature of the alleged defects, that they are due to faulty material and/or workmanship, and the cost of repairing the defects. Neel v. O'Quinn, supra; Clark v. Whitener, 296 So.2d 393 (La.App. 2d Cir.1974), writ denied, 299 So.2d 795 (La.1974).
Allstate argues that because of the statutory immunity afforded contractors, the trial court erred when it awarded damages under the contract in favor of the Browns. La. R.S. 9:2771 provides as follows:
No contractor, including but not limited to a residential building contractor as defined in R.S. 37:2150.1(9), shall be liable for destruction or deterioration of or defects in any work constructed, or under construction, by him if he constructed, or is constructing, the work according to plans or specifications furnished to him which he did not make or cause to be made and if the destruction, deterioration, or defect was due to any fault or insufficiency of the plans or specifications. This provision shall apply regardless of whether the destruction, deterioration, or defect occurs or becomes evident prior to or after delivery of the work to the owner or prior to or after acceptance of the work by the owner. The provisions of this Section shall not be subject to waiver by the contractor.
The statute departs from the more general standard that every construction contract be performed in a good, workmanlike manner, free from defects in materials and workmanship. See Winford Co., Inc. v. Webster Gravel & Asphalt, Inc., 571 So.2d 802 (La.App. 2d Cir.1990). It provides a safe harbor to the contractor so long as plans and specifications are not provided by him. In such an instance, he is immune from liability upon constructing in compliance therewith. Mt. Mariah Baptist Church, Inc. v. Pannell's Assoc. Electric, Inc., 36,361 (La.App. 2d Cir.12/20/02), 835 So.2d 880, writ denied, 03-555 (La.5/2/03), 842 So.2d 1101; Winford Co., Inc. v. Webster Gravel & Asphalt, Inc., supra.; Master Maintenance Engineering, Inc. v. McManus, 292 So.2d 284 (La.App. 1st Cir.1974).
*914 Initially, we find that there was sufficient evidence to show that the defects in the structure were not the result of the insufficiency of plans provided by the Browns, but were the result of the quality of the workmanship of Allstate. Accordingly, we find no direct protection for Allstate under the statutory immunity of La. R.S. 9:2771. Nevertheless, the Browns did provide the plans and accepted some, if not most, of Allstate's work after the framing and roofing work was completed. They then went forward with the sheetrocking, insulation, and finishing work without requiring that all specifications of their plans be met and the alleged defects be corrected by Allstate. This failure on their part to give a complete notice of the deficiencies to Allstate and to require corrections pursuant to their plans before the finishing of the home creates a mitigation of damages or estoppel issue[1] which is taken into account in our ultimate assessment of damages below.
In its ruling, the trial court did not specifically address the issue of substantial performance in accordance with the above jurisprudence. The court did deny Allstate's request for the offset of the unpaid balance on the contract against the awarded amount of damages. The large award of damages itself reflects the trial court's error in not considering substantial performance.
The Browns' expert, Maroney, prepared an itemized list of damages based primarily on the cost of repair of each defect. All items, except the roof, totaled less than $10,000, as we will review in more detail below. Maroney listed the cost of totally removing and rebuilding the roof at $60,000. This would include 2×8 rafters and would allow for the higher exterior walls for the second floor called for in the plans. Maroney, however, when pressed on cross-examination regarding the practicality of his $60,000 re-roofing estimate, responded as follows:
Q. Okay. Now, is that in your opinion, is that a practical solution to Mr. Brown's problem of having forty-one inch walls in the upstairs bedroom?
A. That's a different story.
Q. Okay. Well, that's  I'm asking for your opinion. Is that a practical?
A. I mean I was asked how  what would it cost to completely fix the house.
Q. Okay. Now, I'm asking a new question.
A. Now, again this gets back to  that room can be adjusted. And the walls can be built inside that and move out some. That would repair it, would make the walls, the house, the rooms smaller than what it was originally called for. But, it said, the cost of doing that would be considerably less. There's one of the closets in there, that you couldn't fix that at all, because the way those rafters come through that, you couldn't fix that, unless you completely change the roof out. But, I mean there's enough, parts of that house, that could be fixed without having to tear the whole thing, the roof off of it.
Q. Okay, now....
A. But, again that was not the question at the time to ask me.
Q. Okay. Now, my question now is, is that a practical solution to tear the roof off of the house in your opinion?

*915 A. I would not tear the roof off the house.
Q. So, the answer to that is no, that's not a practical solution?
A. That to me would not be a practical solution. And, I don't think Your Honor, would end up saying that's a practical solution.
On a similar note, in discussing the fact that many of the rooms in the house were not square, Maroney admitted that he was required to take precise measurements for that determination since "the naked eye would not pick up" those problems. Also, although he felt that the inside staircase needed to be reconstructed because of the variance in the rise between the steps, he admitted that limited use of the stairs in the garage allowed for a more relaxed application of the safety code standards for those stairs.
These candid admissions by the Browns' expert demonstrate to us that Allstate substantially performed its contract. The use of the shell framed structure served the purpose of the parties' contract allowing the other contractors to complete the home, despite the defects. Some of the defects were aesthetic in nature. The Browns have been able to realize the use and benefits of Allstate's work despite the problems. The trial court's error in failing to consider the issue of substantial performance therefore skewed its assessment of the Browns' damages which were granted in excess. Clearly, the $55,000 judgment erroneously awarded damages for the removal of the roof which Maroney admitted was unnecessary. Since the written rulings of the trial court do not detail its assessment of each defect nor list the calculation of the damages therefor, we will review each alleged defect and determine the award for damages de novo.[2]
In Maroney's discussion of the problem with the height of the upstairs exterior walls and the roof, he admitted that the problem could stem in part from the plans which the Browns obtained off the internet. He never verified whether the size of the upstairs rooms were in keeping with the plans. He stated however his opinion that Thompson's failure to have drawn up framing plans in advance of construction contributed to the problem. Maroney's testimony indicates that a correction of the problem, whatever its cause, would have been to move the walls inward allowing for the pitch of the roof. While this would allow the walls' height of 41 inches to be increased, it would reduce the size of the upstairs rooms as apparently called for by the plans. Maroney cited Thompson's failure to have recognized and advised the Browns of this problem. Nevertheless, Maroney did not exclude defects in the plans as a partial cause of the problem, and after the conclusion of Allstate's work, the Browns' continuation of the finishing of the 41-inch walls shows that they had notice of the obvious problem and did not seek a correction. As shown by his quoted testimony, Maroney recognizes that roof removal is not practical and that a correction could entail relocating the walls that might add to the utility of some of the upstairs space. Also from the testimony, we conclude that the sagging roof cannot be blamed on Allstate's *916 use of the 2×6 rafters, which the Browns ordered from the supplier, but can be attributed to improper bracing of the rafters or deficient plywood.
Since the Browns put all their eggs in the $60,000 roof removal basket, Maroney offered no repair estimate for the relocation of any upstairs walls nor for additional work on the sagging roof. Additionally, upon Allstate's conclusion of its work, the Browns did not dispute the height of the walls or require their relocation as now suggested by Maroney. Under these circumstances, we deny recovery for the upstairs walls, but award $500 for repair of the roof.
The next defect clearly supported by the evidence is the safety code standards problem associated with the main staircase of the home. We accept Maroney's explanation of the problems with the risers and his assessment of $5,000 for rebuilding the staircase. The alleged problem with the garage staircase was not clearly established. Greg Brown was advised to alter the stairs, and Maroney's testimony was not convincing of the need to rebuild them.
Maroney's report found that all of the arches in the house were framed improperly and required adjustments that had cost the Browns $800. This additional cost will be included in the damage award.
Maroney estimated that $1,000 was required to correct a grading problem associated with the slope into the garage and to replace the cracked sidewalk. This cost will be awarded as damages.
The remaining problems identified by Maroney's report involved the misconfigured features of the home associated with the over shot foundation and incorrect and non-square layout of rooms and features within the home. Some of these features according to Maroney created functional problems affecting the utility of the home which he recommended be repaired. According to his report, we fix the amount of these damages at $2,000.
Finally, we note that the Browns' mental anguish and vexation with Allstate's performance is not a compensable, nonpecuniary loss in their breach of contract claim. La. C.C. art. 1998 and its Revision Comment (e); Ostrowe v. Darensbourg, 377 So.2d 1201 (La.1979). Certain misconfigured features which did not diminish the home's utility were claimed to have given rise to nonpecuniary damages. While such architectural features may be considered as "intended to gratify a nonpecuniary interest" under the contract so as to allow for damages under Civil Code Article 1998, we find the proof insufficient on this record to make such an award.
From this review of all the damages associated with Allstate's substandard work, we summarize the total damages as follows:

 Sagging roof $ 500
 Main staircase $5,000
 Framing of arches $ 800
 Garage and sidewalk $1,000
 Misconfigured features $2,000
 ______
 $9,300

Since we find that Allstate substantially performed the contract, it is entitled to its unpaid balance of $10,552, and each award will therefore virtually offset the other.

III.
Allstate's final assignment of error argues that the trial court's assessment of Maroney's $2,800 expert witness fee as a court cost constituted an abuse of discretion.
Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable. La. *917 C.C.P. art. 1920. Witnesses called to testify as expert witnesses shall be compensated for their services, with the amount to be determined by the court and taxed as costs to be paid by the party cast in judgment. La. R.S. 13:3666. An expert witness is entitled to reasonable compensation for his court appearance and for his preparatory work. The trial judge is not required to set an expert fee at the amount charged by the expert witness. The trial judge has great discretion in awarding and fixing costs and expert witness fees. A trial court's assessment of costs can be reversed by an appellate court only upon a showing of abuse of discretion. Mt. Mariah Baptist Church, Inc. v. Pannell's Assoc. Electric, Inc., supra; City of Shreveport v. Chanse Gas Corp., 34,958, 34,959 (La.App. 2d Cir.8/22/01), 794 So.2d 962, writs denied, 01-2657, 01-2660 (La.1/4/02), 805 So.2d 209; Hammock v. Louisiana State Univ. Medical Ctr. in Shreveport, 34,086 (La.App. 2d Cir.11/1/00), 772 So.2d 306.
Factors to be considered by the trial judge in setting the expert witness fee include time spent testifying, time spent in preparatory work for trial, time spent away from regular duties while waiting to testify, the extent and nature of the work performed and the knowledge, attainments and skill of the expert. Additional considerations include helpfulness of the expert's report and testimony to the trial court, the amount in controversy, the complexity of the problem addressed by the expert and awards to experts in similar cases. Hammock v. Louisiana State Univ. Medical Ctr. in Shreveport, supra; Smith v. Scott, 26,849 (La.App. 2d Cir.5/10/95), 655 So.2d 582, writ denied, 95-1450 (La.9/22/95), 660 So.2d 475.
While Maroney testified at trial that he charged $150 per hour for his two hours in court, no other accounting for his time in preparation for trial was given. In view of this and the adjustment of the award by our ruling, we find that the $2,800 award for Maroney's services is unjustified. Accordingly, we reduce the award for his cost to $1,500.

Conclusion
For the above reasons, the trial court's judgment is reversed and judgment is hereby rendered in favor of Allstate in the amount of $10,552.41 for its claim for the unpaid balance under the contract. Judgment is further rendered in favor of the Browns on their reconventional claim in the amount of $9,300. The trial court's assessment of the costs associated with the expert witness is amended to award the Browns $1,500. Costs of appeal are assessed equally to both parties.
REVERSED AND RENDERED.
NOTES
[1] State v. Wilco Const. Co., Inc., 393 So.2d 885 (La.App. 4th Cir.1981); Lane Wilson Co., Inc. v. Gregory, 322 So.2d 369 (La.App. 2d Cir.1975).
[2] Where one or more legal errors interdict the fact-finding process, the manifest error standard is no longer applicable and, if the record is otherwise complete, the appellate court conducts its own independent de novo review of the record and renders judgment on the merits. Succession of Sporl, 04-1373 (La.App. 1st Cir.4/6/05), 900 So.2d 1054; Pruitt v. Brinker, Inc., 04-152 (La.App. 1st Cir.2/11/05), 899 So.2d 46; Contra Kraemer v. Joseph, 04-270 (La.App. 5th Cir.9/28/04), 885 So.2d 22.