941 So.2d 66 (2006)
CITY OF SHREVEPORT Plaintiff-Appellant
v.
NOEL ESTATE, INC., Harold K. Quinn and Evelyn Humphries Quinn Defendants-Appellees.
No. 41,148-CA, 41,149-CA, 41,150-CA, 41,151-CA, 41,152-CA, 41,153-CA, 41,154-CA, 41,155-CA, 41,156-CA, 41,157-CA, 41,158-CA, 41,159-CA, 41,160-CA, 41,161-CA, 41,162-CA, 41,163-CA, 41,164-CA.
Court of Appeal of Louisiana, Second Circuit.
September 27, 2006.
Rehearing Denied October 26, 2006.
*71 Tutt, Stroud & McKay, By Charles G. Tutt, Jennifer P. McKay, C. Gary Mitchell, Counsel for Appellant, City of Shreveport.
Phelps Dunbar, By Susie Morgan, Counsel for Appellees, Quinn Red River, LLC.
Michael J. Vergis, Counsel for Absentee, Appellees.
Before BROWN, DREW and LOLLEY, JJ.
LOLLEY, J.
In this expropriation litigation and during the course of seventeen years, the First Judicial District Court, Parish of Caddo, State of Louisiana conducted three trials and rendered three separate judgments in favor of Quinn Red River, L.L.C. ("QRR"). The City of Shreveport appeals those judgments, and QRR answers the appeal. For the following reasons, we affirm the judgments rendered in 1999 and 2004, and affirm, as amended, the final valuation judgment.

FACTS
This appeal stems from seventeen different expropriation suits by the City of Shreveport (the "City"), filed between September 25, 1987, and September 16, 1988. During the course of litigation, the trial court issued two judgments regarding the issue of ownership of the property. Both judgments were in QRR's favor. Then, after seventeen years of litigation, the trial court entered judgment in favor of QRR determining the property's value and awarding it additional compensation for its property.
This legal saga begins in the 1980s. During that time, the City began plans for the construction of the northern portion of the Clyde Fant Parkway. In order to construct the parkway, the City had to expropriate the land; thus, it filed the seventeen lawsuits, which are listed in Appendix A.. Property in three publicly dedicated subdivisions was affected, those being the subdivisions of Thatchers, Douglas, and Henderson-Ironworks. In the lawsuits, the City sought the expropriation of 35 "parcels," many of which consisted of numerous lots. Eventually, these seventeen lawsuits were consolidated under one proceeding-suit number 337,256. Notably, many of the lawsuits named as defendants *72 Harold and Evelyn Quinn. Mr. Quinn was a local insurance agent who dabbled in real estate investments on the side. Since the early 1970s, Mr. Quinn had begun purchasing lots in the three subdivisions, eventually owning what we will refer to collectively as the "property." It is that property which is the subject of this appeal. On February 14, 1988, Harold Quinn died; thus, on some of the later filed expropriation suits, Evelyn Quinn was named both individually and as executrix of his succession.[1]
In 1987 and 1988 the City deposited the amounts owed for the property into the registry of the court (totaling $130,848.00) and expropriated the necessary property for the construction of the roadway. The money sat there and no action was taken.
In 1993, the City, QRR and a curator for all of the unknown defendants in the consolidated actions, filed a joint motion to bifurcate the trial to resolve the issue of ownership of the property listed in the various expropriation actions prior to a determination of the just compensation for the property. QRR also sought authority to withdraw the funds from the registry of the court. On March 12, 1999, a judgment was entered in favor of QRR declaring it to be the owner of all of the expropriated property. QRR withdrew the deposited funds pursuant to that judgment (the "1999 Judgment").
In February 2002, QRR filed an answer in the consolidated actions. In that answer, it asserted that just compensation was not paid for the expropriated property. QRR also sought damages in connection with property which was not expropriated but was within QRR's claimed property, asserting that property had been damaged as a result of the expropriation. In response, the City filed an Exception of Prescription (it had been 14 years since the last expropriation suit had been filed), claiming that QRR could not add new properties not the subject of any of the expropriation actions.
In December 2003 a trial was conducted to resolve the issue of ownership raised in QRR's 2002 answer. After the trial, a judgment was entered in favor of QRR, finding it the owner of all the property in the 23-acre parcel it claimed (the "2004 Judgment"). The parties had agreed to try the issue of valuation after resolving the ownership issue.
Following that trial, a compensation trial was held in September 2004. As stated, the City had originally deposited $130,848.00 in compensation at the time of the expropriation. At the trial, QRR sought additional money for the property expropriated as well as damages to other parts of the property it claims were affected by the expropriation. The trial court issued its valuation ruling in favor of QRR, and the City filed its motion for new trial, arguing that the judgment failed to comply with La. R.S. 48:456(A), which requires an itemization of amounts for damages, attorneys' fees and costs. The trial court then entered an amended and final valuation judgment in favor of QRR (the "Valuation Judgment"). The City now appeals that judgment, and QRR answers the appeal.

DISCUSSION
Not surprisingly, considering that this litigation has been ongoing for almost 20 years, the facts involved are somewhat *73 convoluted. Additionally, the legal issues are complicated, unusual, and read like a Louisiana Civil Code problem on a bar examination. However, despite the numerous volumes of record, pages of trial transcript, and court filings, the case can be boiled down as follows.
There are three judgments involved that address different portions of the disputed property: the 1999 Judgment, the 2004 Judgment, and the Valuation Judgment. The 1999 Judgment involved the ownership of the expropriated property highlighted in trial exhibit 241, which we will make a part of this opinion and refer to as "Appendix B." The 2004 Judgment involved the ownership of additional property affected by the expropriation and highlighted in trial exhibit 240, which we will also make a part of this opinion and refer to as "Appendix C." Finally, the Valuation Judgment involved the valuation of all the property. The City appeals all three judgments, and QRR answers the appeal, seeking a higher valuation of the property.

Ownership of the Property
Before addressing the merits of this litigation regarding ownership of the property, we note comments made by Judge Scott Crichton in his oral reasons for ruling on that issue following the 2004 trial:
The [trial] Court is compelled to make two observations which are factored into the analysis of this case. First, it is significant, particularly in light of Louisiana Code of Civil Procedure 3654, that no person nor entity other than [QRR] has come forward and asserted any ownership or any claims of possession to any of the property at issue. Particularly, in light of the testimony . . . regarding fencing and "posted" signs, coupled with . . . testimony regarding both the fences and gates and extensive acts of possession, the Court concludes that the land at issue was openly possessed and exclusively maintained by the Quinn family.
Second, notwithstanding Quinn's invitation, the City has declined to name any person or entity that claims ownership or possessory rights to any of the property at issue. Many of the parties initially named by the City as potential owners requested dismissal and asserted no ownership of the subject property, and others made no appearance whatsoever. Thus, while the City has argued extensively that [QRR] has no ownership rights to certain parcels of the land at issue, it has declined to indicate who or what entity does own certain of those parcels.
Notably, after reviewing this lengthy record, we are compelled by those same observations and questions which stand out and must necessarily navigate the course that this opinion follows. Furthermore, we also note that often times, first impression, simple logic, and equity should be combined with legal reasoning to guide courts in reaching an ultimate conclusion. Thus, the observations made by the trial court are shared by this court (particularly after reviewing this lengthy record) and have served to steer us to our final destination.
The 1999 Judgment
The City's first two assignments of error address the 1999 Judgment. First, they argue that, under a strict reading of the judgment, it did not explicitly determine that QRR owned the expropriated property at the time of the expropriations. Second, the City argues that the trial court erred when a subsequent trial court judge (Judge Crichton) interpreted the 1999 Judgment to state that QRR owned the property at the time of the expropriations. For the following reasons, *74 we conclude that neither assignment of error has merit.
As stated, the 1999 Judgment addressed the ownership of the property originally described by the City in its various expropriation lawsuits. This judgment was rendered following a trial before Judge John Mosely. After the various expropriation suits were filed, the trial court issued various orders allowing the expropriation of the property described in the suits. This occurred in 1987 and 1988. In 1992 QRR acquired new counsel, the same as they presently have in this appeal. In July 1992 the Quinns and the City filed a joint motion to consolidate the presently numbered action with the sixteen lawsuits listed herein, and the trial court ordered the consolidation. Then, in February 1993 the City and QRR filed a joint motion to bifurcate the trial of the matter, alleging that "at issue in the consolidated actions is the ownership of the property expropriated and the just compensation due the owners of the property expropriated." The City prepared and filed the memorandum in support of the joint motion to bifurcate the trial, stating that the request was based on La. C.C.P. art. 1038 and relying on State Through Dept. Of Highways v. Kilchrist, 222 So.2d 635 (La.App. 3d Cir.1969) for support. The trial court ordered that the trial of the matter "be bifurcated such that there shall first be a separate trial of the ownership of the property expropriated and then a separate trial of the just compensation due the owners of the property."
Whereas QRR has filed a motion to dismiss the City's appeal of the 1999 Judgment arguing that the City failed to timely appeal the judgment, and despite the possible merit to QRR's motion, we will address the merits of the 1999 Judgment and affirm it for the following reasons. Furthermore, we agree with the trial court that the 1999 Judgment determined that the Quinns owned the property at the time of the expropriation.
Louisiana C.C. art. 1853 states, in pertinent part, "A judicial confession is a declaration made by a party in a judicial proceeding. That confession constitutes full proof against the party who made it." To constitute a judicial confession the statement must be the express acknowledgment of an adverse fact, the effect of which is to waive evidence as to the subject of the admission or to withdraw the matter from issue. State v. Lamb, 31,919 (La.App.2d Cir.05/07/99), 732 So.2d 1270. Additionally, the adverse party must have believed the fact was no longer at issue or must have relied on it, to his detriment, before it can be a judicial confession. Id., citing Alexis v. Metropolitan Life Ins. Co., 604 So.2d 581 (La.1992).
First, we reiterate that seventeen expropriation lawsuits were originally filed by the City. As explained herein (and as the record reflects), the 1999 Judgment pertained to the property described and expropriated in those lawsuits. See Appendix B. In thirteen of those lawsuits, the City named Harold Quinn (and after his death, his succession) and Evelyn Quinn as a defendant or co-defendant.[2] Notably, Louisiana R.S. 19:123(2) requires that:
The [expropriation] petition shall contain a statement of the purpose for which the property is to be expropriated, describing the property necessary therefor with a plan of the same, a description of the improvements thereon, if any, and the name of the owner if known.
*75 That noted, the City named the Quinns as defendant(s) in the various lawsuits; thus, if the City acted pursuant to the expropriation statutes, as it claimed it did, the City named the Quinns because it believed them to be owner (or co-owner) of the property. We consider such allegations by the City to serve as a judicial admission that the Quinns had an ownership interest in the property expropriated.
Prior to the trial leading up to the 1999 Judgment, as to the other defendants that were named by the City in the various lawsuits, several of those defendants filed, along with QRR, joint motions to be dismissed from the expropriation lawsuits. Those motions were granted, and the defendants were dismissed, leaving QRR as the only party with an ownership interest. In other lawsuits, a number of the defendants' whereabouts were unknown and the City claimed they were probably deceased. Those defendants were represented by curators and made appearances at the first ownership trial; however, there was no proof of their actual possession or ownership of the property. Thus, QRR proved better title to the property pursuant to La. C.C.P. art. 3654, and the trial court properly determined it to be owner of the property expropriated. Additionally, the trial court also properly allowed QRR to withdraw the funds deposited by the City in the registry of the court.
Finally, as to the 1999 Judgment and the City's contentions in this appeal, it strikes this court as disingenuous for the City to admit, as the record clearly reflects, that it had no interest in 1999 in contesting the distribution of the funds originally deposited and obviously did not dispute at that time the Quinns' right to those funds and obvious ownership of the property, only to subsequently dispute the Quinns' actual ownership of the property when the Quinns sought additional damages. Another glaring fact we consider, as the trial court noted, is that no other individual or party has ever come forward in the 20 years this litigation has ensued and claimed ownership of any of this attractive and obviously valuable property. Nor, of the numerous other additional defendants named in the seventeen various lawsuits, did one other individual come forth to claim the proceeds deposited in the registry of the court. Clearly, when the trial court considered the evidence presented at the 1999 hearing along with the facts that (1) the City actually named the Quinns as owner in almost all of the expropriation lawsuits and did not dispute their initial claims for ownership or for the deposited funds (i.e., an amount the City was willing to pay if the Quinns took it and would go away), and (2) the Quinns were the only parties claiming ownership and providing any evidence of their ownership of the property, it did not err in concluding the Quinns to be the owners of the expropriated property as designated in Appendix B.
As to the City's argument that the trial court erred in not allowing additional evidence at the later ownership trial regarding the 1999 Judgment, we find no merit to this assignment of error. Pursuant to La. C.C.P. art. 1631, "[t]he court has the power to require that the proceedings shall be conducted with dignity and in an orderly and expeditious manner, and to control the proceedings at the trial, so that justice is done." This matter had already been tried and a final judgement had already been rendered. The City had its opportunity to dispute the ownership issue at the time that single issue was being tried. Additionally, the City did not show that the additional evidence it sought to admit was evidence it did not have at the earlier trial. The trial court was completely within its discretion not to allow the *76 City a second bite at the apple, and this assignment of error is without merit.
The 2004 Judgment
The 2004 Judgment stems from QRR's answer filed February 4, 2002. In that pleading, QRR answered the original expropriation lawsuits and claimed that the City failed to adequately compensate it for its loss due to the expropriation regarding (1) property that was actually taken, and (2) the rest of its property that was only affected by the taking. Notably, QRR alleged that the City's original valuation of the property was based on individual small tracts and did not consider the property as one tract, as QRR possessed and owned it. In response to QRR's answer, the City filed an exception of prescription, arguing that pursuant to La. R.S. 13:5111, QRR's claim for damages against it had prescribed. The City maintains that in its answer, QRR sought damages for additional property-property that was not part of the original expropriation lawsuits. Thus, according to the City, QRR's claims, which the City characterizes as new, were prescribed.[3] Ultimately, the trial court determined that QRR owned the property referred to in its answer, ruling against the City on its exception of prescription-i.e. the 2004 Judgment.
In its third assignment of error, the City maintains that the trial court erred in failing to find QRR's claims prescribed. We disagree. First of all, we note that statutes of prescription must be strictly construed. Mercer v. Mercer, 40,995 (La.App.2d Cir.05/17/06), 930 So.2d 348. The particular statute that the City relies upon is La. R.S. 13:5111(A), which states:
A court of Louisiana rendering a judgment for the plaintiff, in a proceeding brought against the state of Louisiana, a parish, or municipality or other political subdivision or an agency of any of them, for compensation for the taking of property by the defendant, other than through an expropriation proceeding, shall determine and award to the plaintiff, as a part of the costs of court, such sum as will, in the opinion of the court, compensate for reasonable attorney fees actually incurred because of such proceeding. Any settlement of such claim, not reduced to judgment, shall include such reasonable attorney, engineering, and appraisal fees as are actually incurred because of such proceeding. Actions for compensation for property taken by the state, a parish, municipality, or other political subdivision or any one of their respective agencies shall prescribe three years from the date of such taking. (Emphasis added).
Simply put, the City maintains that QRR's claims are prescribed, because they pertain to other property that was not part of the original expropriation lawsuits and La. R.S. 13:5111(A) applies, barring QRR's claims by prescription. QRR takes the position that the City failed to sufficiently describe all of the property in the original expropriation lawsuits, and that its entire parcel of property was damaged as a result of the expropriation proceeding; thus, La. R.S. 13:5111(A) is not applicable to their claims for severance damages. Consequently, the trial court had to consider the ownership issue first, in order to determine whether QRR's claims had prescribed or not.
The primary problem, as we see it, is that the property ("the farm" as the *77 Quinns referred to it), was not legally described as one parcel or tract of land at all. Although QRR refers to the property as one tract or parcel of property, it was in fact various lots from three different subdivisions-which is, in effect, the basis for the City's argument on prescription. The legal effect is that if the property is treated as a unit of property, QRR might be entitled to severance damages as an effect of the expropriation and its claims are not prescribed. If the property is not considered a unit, and the QRR's claim for the added property was one of inverse condemnation, then QRR's claims might be prescribed. Although the trial court ultimately ruled on the merits of the case in favor of QRR, denying the City's exception of prescription, it did not enunciate a legal reason for the denial. For the following reasons, we conclude that QRR's claim was for severance damages and was not prescribed-even though it seemed to add property not originally expropriated.
The fact that the property was in fact made up of numerous lots-some of which were actually expropriated for the construction of the parkway, others which were not-does not necessarily defeat QRR's claim for severance damages to the whole. Numerous cases have held that vacant tracts of land separated merely by lot lines were to be treated as a single unit of land for the purpose of assessing damages due for the taking of a portion of the land. See 59 A.L.R.4th 308, Eminent Domain, § 41(a), 1988 WL 546633 and citations therein.
Specifically, in State Through Dept. Of Highways v. Cefalu, 288 So.2d 332 (La. 1974), the Louisiana Supreme Court determined that if a claimant can prove unity of use, i.e., that all of the tracts were used for the same purpose as a single unit, then severance damages for all of the property will be recoverable. Id. at 334. The determinative factors underlying the Louisiana unity of use doctrine are a unified use in fact, coupled with a legal right to effect that unified use, i.e., ownership. Id. at 337.
As stated in State Through Dept. of Highways v. Williams, 131 So.2d 600 (La.App. 3d Cir.1961):
Ordinarily whether a landowner's holding constitutes a single tract or not for purposes of determining severance damages is a practical question to be decided by the trier of fact, which trier "should consider evidence on the use and appearance of the land, its legal divisions and the intent of the owner and conclude whether on the whole the lots are separate or not. In such cases the land itself rather than the map should be looked at, and one part of the parcel is not to be considered separate and independent merely because it was bought at a separate time from the rest and is separated from it by an imaginary line," citing, 4 Nichols, The Law of Eminent Domain (3rd ed., 1951) Section 14.31, pp. 431-432.
Here, the evidence at trial is clear that the property was used as a unified piece of property by the Quinns at the time of the expropriation. Testimony by Mrs. Quinn and two of the children detailed that on the property the Quinns: regularly visited for recreation purposes; kept various animals; maintained fencing with "posted" signs; and, hosted Fourth of July parties. There was evidence that for several years Mr. Quinn gave permission to The Times (the Shreveport newspaper) to shoot its annual celebratory fireworks from the property. In fact, in the correspondence between the newspaper and Mr. Quinn, the property was actually defined as being "[t]he property . . . bordered by Red River on the east, with the Levee being the west boundary. The south boundary is Cross *78 Bayou and the north boundary is in the area of Mr. Quinn's north fence line." Further, the City received permission from Mr. Quinn to shoot fireworks for the City's Sesquicentennial Celebration in 1985. Mr. Quinn kept paper records of work done on the property-many of which referred to "the Quinn farm" as the site where the work was performed. Aerial photographs taken and which were presented into evidence showed two mobile homes Mr. Quinn had placed on the property. In fact, from those aerial photos, the property appeared to be one tract of land. The evidence of the Quinns' use of the property from 1972 until 1987 was noted by the trial court and was not an abuse of discretion. Thus, we conclude that QRR showed that the property was unified in its use.
As to the legal right for that use, i.e., the ownership of the property-that is the issue which is hotly disputed in this litigation. We have already dispensed with the ownership issue as it pertains to the 1999 Judgment and the property shown on Appendix B. In the City's fifth assignment of error, it argues that the 2004 judgment in favor of QRR was erroneous because (1) the public was the owner of the dedicated streets and alleyways contained in the three subdivisions at issue; (2) Mr. Quinn did not obtain ownership of property contained in the "squatter's" deed because he was not in legal good faith for purposes of acquisitive prescription; and (3) QRR's possession was not sufficient for acquisition by acquisitive prescription.
The dedicated streets and alleyways
When considering the issue of the ownership of the dedicated streets and alleyways, we make two observations. First, those streets and alleyways had been dedicated as such by the owners of the land when the three subdivisions, Thatchers, Douglas Island, and Henderson-Iron-works, were formed in 1871, 1903, and 1904 respectively. Notably, the settlement of Agurs, of which the three subdivisions were part, was not a part of the City of Shreveport at the time. Although the streets and alleyways were dedicated, not only were they never used, they were not even actually constructed. Second, the aerial photographs of the property corroborate the fact that other than dirt paths/roads on the property (which, incidentally, do not correspond with the streets and alleyways on the subdivision maps), there were no constructed roadways or alleyways on the property, as designated in the subdivision plat maps. The aerial photographs are extremely convincing to show that this property never included any streets or alleyways, was completely unimproved, and appeared to be (as discussed herein) one piece of unimproved, rural property.
QRR argued that its ancestors in title had legally obtained title to the dedicated streets due to a change in course of the Red River, a navigable waterway, in the 1920s. The trial court agreed that the City was divested of its ownership of the unbuilt public streets when they were covered by the Red River (i.e., they became "undedicated"), and that once the river eventually subsided, the ownership of the streets and alleys, the former riverbed, reverted to the private landowners. The City claims this finding was in error.
"Public things are owned by the state or its political subdivisions in their capacity as public persons. . . . such as running waters, the waters and bottoms of natural navigable water bodies, the territorial sea, and the seashore." La. C.C. 450. Thus, when the land encroached upon by a state-owned waterway forms a part of the bed of a navigable stream it becomes the property of the State as a public thing, and the former owner is divested of title. According *79 to QRR, this is what happened when the Red River formed a new channel in the 1920s. Miami Corp. v. State, 186 La. 784, 173 So. 315 (La.1936), cert. denied, 302 U.S. 700, 58 S.Ct. 19, 82 L.Ed. 541 (1937). When the Red River was eventually reverted to its former channel, the riverbed was abandoned, and the owners of the property became reinstated as owners of the abandoned bed, along with the unbuilt streets and alleys in proportion to their previous ownership. See Fitzsimmons v. Cassity, 172 So. 824 (La.App. 2d Cir.1937).
The effect and weight to be given to expert testimony rests within the broad discretion of the trier of fact. Williams v. State Farm Mut. Auto. Ins. Co., 36,439 (La.App.2d Cir.10/23/02), 830 So.2d 379. It is well accepted that the trier of fact is charged with the determination of what credibility it assigns to expert witnesses and the decision about which expert among those testifying is more credible. Hayes v. Entergy Corporation, 37,190 (La.App.2d Cir.06/25/03), 850 So.2d 916. Credibility determinations, including the evaluation and resolution of conflicts in expert testimony, are factual issues to be resolved by the trier of fact which should not be disturbed on appeal absent manifest error. James v. Robinson, 38,774 (La.App.2d Cir.08/18/04), 880 So.2d 975.
Here, we do not believe the trial court abused its discretion in accepting the opinion of QRR's expert on this issue, Gary Joiner, who had previously been recognized and qualified as an expert in the areas of history, geography, demography, and cartography. Joiner, relying on newspaper articles and photographs from the period and later, testified that in the 1920s the Red River had formed an alternate western channel across much of the property subject of this litigation. One photo he referred to clearly depicted the area covered with water from the channel of the river. Incidentally, the City's expert regarding the ownership issue, attorney Reginald Cassibry, stated that he agreed that if the riverbed covered dedicated streets, then the dedication was lost, and the private landowners secured ownership of the property clear of the dedication. Further, we note and stress the trial court's characterization of Joiner's testimony as being "unimpeached and unrebutted." We find that there was no manifest error on the trial court's part in accepting the testimony by Joiner that the river channel had shifted in the 1920s, and its ultimate legal conclusion based on that testimony that the unbuilt streets and alleyways reverted to the owners of the contiguous property once it was no longer river bottom.
Additionally, the City argues that the trial court only determined that the Red River opened another river channel which covered "many" of the unbuilt streets and alleys, not all of them. Thus, the City maintains that the trial court's judgment did not address all of the streets which were originally dedicated on the property. However, the fact that the river channel did not cover all the streets and alleys is immaterial. When the river changed its course, not only did it cover most of the unbuilt streets, but whichever ones were not covered by water were cutoff by the water. When those unopened streets were cutoff by the river in the 1920s they were deemed to be abandoned. See Ayer v. Kirkwood, 9 La.App. 306, 119 So. 475 (La.App. 1st Cir.1928), writ of review denied, Louisiana Supreme Court, Jan. 2, 1929. Thus, we conclude that as a result of the change in the course of the Red River, all of the dedicated but unopened streets and alleyways on the property reverted to the ownership of QRR's *80 respective ancestors in title. The trial court was not in error on this issue.[4]
Acquisitive Prescription
The City also argues that the trial court erred in finding that QRR acquired ownership of numerous pieces of the property through 10-year acquisitive prescription. Specifically, the City states that Mr. Quinn was not in good faith "in the legal sense," because the basis for some of the ownership claims was a deed between him and Luther Burns, whom the city characterizes as a squatter. We disagree.
Ownership and other real rights in immovables may be acquired by the prescription of ten years. La. C.C. art. 3473. The four requisites for ten years' acquisitive prescription are: (1) possession for ten years; (2) good faith; (3) just title; and (4) a thing susceptible of acquisition by prescription. La. C.C. art. 3475; Ryan v. Lee, 38,352 (La.App.2d Cir.04/14/04), 870 So.2d 1137, writ denied, XXXX-XXXX (La.10/01/04), 883 So.2d 991. For purposes of acquisitive prescription, a possessor is in good faith when he reasonably believes, in light of objective considerations, that he is owner of the thing he possesses. La. C.C. art. 3480. As further explained in the revision comments to art. 3480, "[t]he trier of facts [sic] thus must ascertain in the light of objective considerations whether a reasonable person in the position of the possessor could believe himself to be the owner." Good faith is presumed; thus, one who alleges that the possessor is not in good faith has the burden of proving his allegation. The presumption of good faith is rebutted on proof that thepossessor knows, or should know, that he is not owner of the thing he possesses. La. C.C. art. 3481.
Knowledge of the seller's lack of right or interest in the property is not imputed to the buyer, and the buyer's error in buying from that seller is an error of fact. A buyer who purchases under an error of fact does so in legal good faith. Melancon v. Wood, 357 So.2d 75 (La.App. 4th Cir.1978), writ denied, 359 So.2d 201 (La.1978). As stated in Board of Com'rs for Lafourche Basin Levee Dist. v. Elmer, 268 So.2d 274 (La.App. 4th Cir.1972), writ refused, 263 La. 613, 268 So.2d 675 (La.1972):
[i]n the case of a nonwarranty deed . . . such a deed is not alone sufficient to preclude good faith on the part of the possessor (as held in the early cases), but must be considered with other evidence that the possessor doubted the validity of his title. A person ignorant of defects in his title is a good faith possessor, C.C. arts. 503, 3451, and a person who knows of defects in his title is a bad faith possessor, C.C. art. 3452. The determination must stand or fall on the facts and circumstances of each case.
When considering the issue of a possessor's good faith, the totality of the circumstances must be considered in order to *81 rebut the presumption. Phillips v. Parker, 483 So.2d 972 (La.1986).
Primarily, we note that the issue of possession hinges on proof-and the burden of proof in this case on this particular issue was with the City, not QRR. Unfortunately, neither of the parties to the act, Mr. Quinn or Mr. Burns, was alive to testify at the trial of the matter. Thus, the evidence the City relied upon to rebut the presumption of good faith was the actual conveyance document between the men. Relying on that, the City pointed to what it argued was inadequate consideration paid by Mr. Quinn to Mr. Burns. In Phillips, the Supreme Court specifically determined that ". . . a purchase by quit claim deed or at an extremely low price may be suggestive (but not conclusive) of knowledge of title defects which may rebut the presumed good faith of the purchaser." Id. at 978. As pointed out by the trial court, however, even the City's expert, Cassibry, indicated that the argument of inadequate consideration was hard to evaluate. Notably, although the City argues that the price paid to Mr. Burns was inadequate, this was only argument. Whereas the City compared prices paid by Mr. Quinn to some of his other vendors, it offered no definitive proof, such as actual appraisals of the property in 1972, of what Mr. Burns' property was worth. Furthermore, although the City characterized Mr. Burns as being a squatter, it offered little conclusive proof that he was indeed. Surely, based on all of the evidence heard and considered by the trial court at the trial, it was in the best position to make an evaluation and accept or reject the City's position on this issue. Considering that the City had the burden of rebutting the presumed good faith of Mr. Quinn, we cannot say that the trial court's ultimate conclusion on this matter was an abuse of discretion.
Possession
The City also argues that QRR failed to prove another element of acquisitive prescription-possession. The City maintains that the trial court erred in finding QRR's evidence sufficient to prove the Quinns' possession of the property. The trial court determined that based on the testimony at trial, ". . . it is clear that there were numerous and extensive acts of open possession and ownership from 1972 and 1987 when the property was expropriated." Such a finding was not in error.
To acquire possession, one must intend to possess as owner and take corporeal possession of the thing. La. C.C. art. 3424. Corporeal possession is the exercise of physical acts of use, detention, or enjoyment over a thing. La. C.C. art. 3425. The party alleging acquisitive prescription must establish that his possession has been continuous and uninterrupted, peaceable, public and unequivocal. La. C.C. art. 3476. The corporeal possession necessary to support the plea of prescription must include such external signs of possession as to indicate clearly that the possessor holds control and dominion over the property. Jacobs v. Southern Advance Bag & Paper Co., 228 La. 462, 472-73, 82 So.2d 765, 768 (1955).
What constitutes possession in any case is a question of fact, and each case depends upon its own facts. Skillman v. Harvey, 2003-2724 (La.App. 1st Cir.12/30/04), 898 So.2d 431, writ denied, 897 So.2d 610, XXXX-XXXX (La.04/01/05). A trial court's factual finding of possession cannot be set aside absent manifest error or unless the finding is clearly wrong. See Livingston v. Unopened Succession of Dixon, 589 So.2d 598 (La.App. 2d Cir. 1991).
Here, the trial court noted its reliance on the testimony of Kelly Quinn Barnett, *82 Kevin Quinn, Evelyn Quinn, Janice Sullivan, and J.W. Perritt on the issue of the Quinns' possession of the property. We do not consider this reliance misplaced, nor was the trial court's conclusion on the issue of possession manifest error or clearly wrong. Initially, we point to our discussion herein regarding the issue of unity of use of the property, which also points to obvious evidence of possession by the Quinns.
Next, the testimony by Evelyn Quinn and her children was consistent. They all recalled that the family regularly visited the property they called "the farm" commencing in 1972. They all described the various "farm-like" activities the family engaged in on the property-in fact, activities that occurred all over the property. An aerial photograph of the property taken in 1984 shows physical features and landmarks evidencing the Quinns' possession-the photo is tangible evidence supporting their testimony.
Sullivan's testimony came from the 1999 ownership trial. She worked for Mr. Quinn as his secretary, and she was able to identify many documents that Mr. Quinn kept relating to his ownership and possession of the property. Some of those documents related to: fencing the property; maintaining "posted" signs; planting grass seeds; insuring the property; running utilities and payment of same; the rental of two mobile homes he placed on the property; clearing the property; and filling in a low area. Similarly, Perritt, the owner of a Shreveport fencing company, testified in the first ownership trial. He testified as to doing much of the fence work on the property for Mr. Quinn. Perritt recalled fencing on the north side of the property, along Cross Bayou, on the high bank of the river, and near the levee.
We do not consider the trial court's reliance on the evidence and testimony misplaced, nor was the trial court's conclusion on the issue of possession manifest error or clearly wrong. Notably, the City produced no witnesses or evidence in an attempt to factually controvert QRR's evidence on the issue of possession-the City only argues that QRR's evidence of the Quinns' possession was insufficient. If we consider the nature of the property-rural, waterfront property, it is evident that the fashion in which the Quinns used the property tells us that their possession was "continuous and uninterrupted, peaceable, public and unequivocal." Certainly, the evidence QRR presented at the trial was sufficient to prove this element of acquisitive prescription. The trial court did not err on this issue.

Valuation and compensation
After the trial court issued its 2004 Judgment, a final trial was conducted on September 14, 15, 16, and 20, 2004 regarding QRR's claim for additional compensation. As noted herein, the City had originally deposited $130,848.00 with the registry of the court as compensation for the expropriation. Pursuant to the 1999 Judgment, that amount was withdrawn by QRR, which then sought further compensation and severance damages. At the compensation trial, the trial court considered the testimony and evidence submitted by experts for both QRR and the City. Following the trial, the trial court issued the Valuation Judgment that is being appealed from, awarding QRR $341,143.00, plus attorneys' fees, expert witness fees and costs, and interest. The City appeals that judgment and QRR answers the appeal on that issue as well.
The City argues that the trial court erred in awarding QRR additional compensation, because QRR failed to carry its burden of proving to a legal certainty and by a preponderance of the evidence the value of the property beyond what was *83 already deposited by the City. In reaching its conclusion, the trial court considered the evidence before it on the issue, primarily evidence offered by the expert witnesses retained by QRR and the City. Ultimately, in this classic battle of the experts, the trial court evidently considered QRR's expert testimony the most credible. After review of the record before us, such a determination clearly was not in error.
In deciding to accept the opinion of one expert and reject the opinion of another, a trial court can virtually never be manifestly erroneous. Fox v. Fox, XXXX-XXXX (La.App. 1st Cir.11/06/98), 727 So.2d 514, writ denied, XXXX-XXXX (La.03/19/99), 740 So.2d 119.
Here, QRR retained the services of two expert appraisers, John Doiron and Phillip Moon. Additionally, the appraisers relied on the work of a civil engineer, James Mohr. Despite the City's arguments, we do not believe the trial court committed manifest error in accepting the opinions of QRR's experts over that of the City's. The City argues that QRR's experts' opinion was based on two erroneous presumptions: (1) the property was a single tract, and (2) the property was best suited to "blue ribbon" industrial use, due to its proximity to downtown Shreveport and its location on the Red River. However, considering our discussion regarding the property's unity of use, we have determined that as to the first issue, the trial court was not in error in considering the property as a single tract of land, despite the fact that its legal description was of many different lots and subdivisions. Thus, the trial court did not err in accepting this presumption by QRR's experts.
Regarding Doiron's and Moon's determination that the property was suitable for "blue ribbon" industrial use, the City maintains that Doiron's and Moon's appraisal was not based on fact (whereas its experts' opinions were). The City also argues that Doiron, because he was not a Shreveport appraiser, lacked familiarity with the locality of the property, and, therefore, the trial court should have weighed that against accepting his opinion. We recognize that familiarity with the locality is a factor used in weighing expert testimony in connection with land appraisals. See La. Power and Light Co. v. Dixon, 201 So.2d 346 (La.App. 2d Cir. 1967). However, in this case, Doiron utilized the local expertise of Moon, a Shreveport appraiser, in completing his appraisal of the property. Considering that Doiron used a local appraiser to reach an appraisal value, we do not view Doiron's place of business outside of Shreveport as a detriment at all. Moreover, pursuant to our review of Doiron's and Moon's appraisal report, it appears to be based on sufficient fact-i.e., the City's appraisal report does not appear to be based on any more credible facts than QRR's.
Together, Doiron and Moon concluded that the property would be best suited for heavy industrial use; however, the appraisal report noted that the property would need significant upgrades to make it usable in that capacity. In order to determine how much those upgrades would cost, Doiron and Moon engaged James D. Mohr, a civil engineer, who determined that the cost to be $514,258.00. Doiron and Moon deducted this amount from the amount they concluded the property would have been worth as a "blue ribbon" industrial site in 1987 and they valued the property "as is" (or actually "as was" in 1987) at $490,666. That figure divided by the amount of actual acreage gave them a square foot value of $.50. With that square footage value, Doiron and Moon determined the following: *84 

Total value of land & improvements taken: $222,088.00
Severance Damages: $241,903.00
 ===========
Total just compensation: $463,991.00

The trial court accepted this amount and awarded it to QRR, less $122,848.00 which was previously deposited in the registry of the court for the expropriation and withdrawn by QRR.[5] The final amount awarded for additional compensation to QRR was $341,143.00.
The trial court heard the testimony of all of the expert witnesses, and it was in the best position to consider the in-depth examination and cross-examination of the experts on the issue. The trial court also was able to review the lengthy and detailed appraisal report, which on the cold record has every appearance of being based on fact, along with the actual live testimony of the preparers-Doiron and Moon. All of the experts were subject to examination and cross-examination. Unless QRR's experts opinions were patently unsound, which the City has not conclusively shown, it is not for this court to second guess the conclusions of the trial court on this issue. Thus, we determine that the trial court's conclusion was not in error. Moreover, considering these reasons, we further cannot find that QRR is entitled to any greater amount than that which was already awarded; thus, we conclude that QRR's answer to the City's appeal requesting an increase in the amount of additional compensation is also without merit.
Interest
In its final assignment of error, the City argues that the trial court erred in its interest award on suits numbered 345,808 and 346,594, when it awarded interest on those two suits from the dates of expropriation rather than from the dates of legal demand. We agree.[6]
In 1988, when the expropriations occurred, La. R.S. 48:455 stated:
If the amount finally awarded for compensation exceeds the amount deposited, the judgment shall include legal interest on the excess from the date of legal demand until paid, but such interest shall not accrue on any award made for expert fees or attorney fees prior to judgment.
(Emphasis added). However, in 1992, the statute was amended to state:
If the amount finally awarded for compensation exceeds the amount deposited, the judgment shall include legal interest on the excess from the date of presentation of the petition as provided in R.S. 48:442 until paid, but such interest shall not accrue on any award made for expert fees or attorney fees prior to judgment.
(Emphasis added).
In State Through Dept. of Transp. and Development v. Estate of Davis, 572 So.2d 39, 44 (La.1990), the Louisiana Supreme Court determined that "[l]egal interest is a matter of substantive law and a change in the law that alters an award of legal interest should not be given retroactive effect unless the legislature so provides." Whereas the First Circuit considered the 1992 amendments to the statute as "interpretive," we do not agree and consider the change a substantive one. See State, Dept. of Transp. and Development v. McMillion Dozer Service, Inc., 93-590 (La.App. 5th Cir.05/31/94), 639 So.2d 766, writ denied, *85 94-2345, 94-2348 (La.11/29/94), 646 So.2d 399, cert denied, 514 U.S. 1108, 115 S.Ct. 1958, 131 L.Ed.2d 850 (1995). Thus, as a substantive change, we conclude that the current version of the La. R.S. 48:455 cannot be given retroactive effect, and that the version in effect at the time of the expropriations must be applied. Accordingly, the trial court erred, and the legal interest in suits numbered 345,808 and 346,594 should run from the date of legal demand, which was February 4, 2002. We amend the trial court's judgment accordingly.

QRR's Assignments of Error
In addition to its claim that the amount of compensation was insufficient, QRR raises additional assignments of error in its answer to the City's appeal. First, it argues that the trial court abused its discretion in not awarding the full amount of attorneys' fees allowed under La. R.S. 48:453(E). We disagree.
Here, the trial court awarded QRR $175,000.00 in attorneys' fees. QRR states this amount was lower than the amount allowed under La. R.S. 48:453(E), and under the statute it is entitled to $205,878.78 in attorneys' fees. Louisiana R.S. 48:453(E) states:
Reasonable attorney fees may be awarded by the court if the amount of the compensation deposited in the registry of the court is less than the amount of compensation awarded in the judgment. Such attorney fees in no event shall exceed twenty-five percent of the difference between the award and the amount deposited in the registry of the court.
An award of attorney fees under this article is permissive. Red River Waterway Com'n v. Fry, 628 So.2d 38 (La.App. 2d Cir.1993), writ denied, 93-3050 (La.02/04/94), 633 So.2d 581. The trial court is vested with much discretion, and the award will not be disturbed in the absence of a clear abuse of that discretion. Id. Here, the trial court granted QRR's claim for attorney fees and awarded it $175,000.00 for attorney fees. We do not find this to be an abuse of discretion simply because it does not amount to 25 percent of the difference between the award and the amount deposited into the registry of the court. QRR's assignment of error on this issue is without merit.
QRR also maintains that the trial court erred in its award of expert witness fees and costs. Specifically, QRR notes that the trial court awarded expert witness fees and costs in the amount of $75,000.00 and $7,833.97, respectively, when, in fact, the expert fees and costs incurred were $110,935.20 and $11,138.94, respectively.
Except as otherwise provided by law, the trial court may render judgment for costs, or any part thereof, against any party, as it may consider equitable. La. C.C.P. art.1920. The trial judge has great discretion in awarding and fixing costs and expert witness fees. A trial court's assessment of costs can be reversed by an appellate court only upon a showing of abuse of discretion. Allstate Enterprises, Inc. v. Brown, 39,467 (La. App.2d Cir.06/29/05), 907 So.2d 904.
Specifically as to expert witness fees, witnesses called to testify as expert witnesses shall be compensated for their services, with the amount to be determined by the court and taxed as costs to be paid by the party cast in judgment. La. R.S. 13:3666. An expert witness is entitled to reasonable compensation for his court appearance and for his preparatory work. The trial judge is not required to set an expert fee at the amount charged by the expert witness. Allstate, supra; City of Shreveport v. Chanse Gas Corp., 34,958, 34,959 (La.App.2d Cir.08/22/01), 794 So.2d 962, writs denied, 2001-2657, 805 So.2d *86 209, 2001-2660 (La.01/04/02), 805 So.2d 209; Hammock v. Louisiana State Univ. Medical Ctr. in Shreveport, 34,086 (La. App.2d Cir.11/01/00), 772 So.2d 306. Relevant factors in fixing the fee include the time spent testifying, time spent in preparation for trial, time spent away from regular duties while waiting to testify, extent and nature of the work performed, and the knowledge, attainments of the expert. City of Shreveport, supra. The court may also consider the helpfulness of the expert's report and testimony. Id. Here as to the expert witness fees, the trial court ordered the payment of a substantial portion of the fees, almost 70% of the total. We see no abuse of discretion in the amount of this award.
As to the costs awarded, again such an award is subject to the discretion of the trial court and will not be reversed absent an abuse of that discretion. Louisiana jurisprudence is replete with cases determining such, and we cannot say that, here, the trial court abused its discretion in its award of costs, which was 70% of the total costs expended by QRR in the litigation. Thus, we conclude that the trial court's award of expert witness fees and costs was within its discretion and was not in error.

CONCLUSION
For the foregoing reasons, the 1999 Judgment and the 2004 Judgment in favor of Quinn Red River, L.L.C. are hereby affirmed. The Valuation Judgment is amended in accordance with this opinion as it pertains to interest awarded in suits numbered 345,808 and 346,594, and as amended is also affirmed. Costs of this appeal are not assessed. See La. R.S. 13:4521.
1999 AND 2004 JUDGMENTS AFFIRMED; VALUATION JUDGMENT, AS AMENDED, AFFIRMED.

APPLICATION FOR REHEARING
Before BROWN, STEWART, DREW, MOORE and LOLLEY, JJ.
Rehearing denied.

 APPENDIX A
Suit No. Named Defendant(s) Date filed
337,257 C.L. Rateliff, Harold K. Quinn, 9/25/87
 and Evelyn Humphries Quinn
337,258 W.C. Agurs, Richie Bousseau 9/25/87
 Agurs, Harold K. Quinn, and
 Evelyn Humphries Quinn
337,259 E.D. Foster, C.L. Ratcliff, Harold 9/25/87
 K. Quinn, and Evelyn
 Humphries Quinn
337,260 Virginia Townsend, Harold K. 9/25/87
 Quinn, and Evelyn Humphries
 Quinn
337,261 P.M. Blake, W.C. Agurs, 9/25/87
 Richie Bousseau Agurs, Harold
 K. Quinn, and Evelyn Humphries
 Quinn
337,828 E.F. Sqnquenettie and spouse, 10/18/87
 Harold K. Quinn, and Evelyn
 Humphries Quinn
341,057 Nettie Soniat Wright, Connerly 2/8/88
 I. Wright, Eugenie Soniat Atkis,
 George T. Atkins, Joseph Moore
 Soniat, Joe B. Atkinson, Jr.,
 Richia Atkinson Hail
341,215 Noel Estate, Inc. 2/24/88
342,054 W.C. Agurs and spouse, Richie 3/29/88
 B. Agurs, Spouse of J.G. Jones,
 Succession of Harold K. Quinn,
 and Evelyn Humphries Quinn
342,055 Mrs. M.D. Agurs, W.C. Agurs, 3/24/88
 Continental Bank & Trust Co.,
 Spouse of Walter C. Cochran,
 Succession of Harold K. Quinn,
 and Evelyn Humphries Quinn
342,056 Jessie-Lee F. Decker, Spouse of 3/29/88
 Orlando T. Decker, Spouse of
 Lydia Decker
342,775 Succession of Harold K. Quinn 4/27/88
 and Evelyn Humphries Quinn
345,766 Succession of Harold K. Quinn 8/12/88
 and Evelyn Humphries Quinn
345,767 Succession of Harold K. Quinn 8/12/88
 Evelyn Humphries Quinn, Marjorie
 Bushey Atkinson, Richia
 Atkinson Hail
*87
345,808 Succession of Harold K. Quinn, 8/16/88
 Evelyn Humphries Quinn, Mary
 Faye Dinwiddie indivdually and
 as trustee, Petty Realty Camp,
 Inc.
346,594 Emily Denning Erickson, August 9/16/88
 Erickson, Dorothea Erickson
 Valerius, C.B. Erickson, Jr.,
 Marjorie B. Atkinson, Richia
 Atkinson Hail, Succession of
 Harold K. Quinn, and Evelyn
 Humphries Quinn

*88 
*89 
NOTES
[1] Later, on April 11, 1996, Evelyn Quinn, individually and as executrix of the Succession of Harold R. Quinn, transferred all of their interest in the property to Quinn Commercial Property, L.L.C. On October 8, 1998, that entity deeded the property to Quinn Red River, L.L.C., the entity that is currently a party to this litigation. For ease of reference, despite the time period, we will refer to the party in interest as QRR.
[2] Those proceedings were First Judicial District Court nos. 337,257; 337,258; 337,259; 337,260; 337,261; 337,828; 342,054; 342,055; 342,775; 345,766; 345,767; 345,808; and, 346,594.
[3] QRR filed a motion requesting the trial court consider the City's exceptions after the trial of the ownership issue. Pursuant to a minute entry dated May 19, 2003, the parties agreed to defer the prescription issue to the ownership trial.
[4] Although we conclude that the trial court did not abuse its discretion in accepting Joiner's testimony, and consequently QRR's waterbed theory, we cannot ignore the fact that almost 100 years went by at the time of the expropriation, and the streets and alleyways in question were never constructed.

Although we are well aware that private persons may not acquire property by acquisitive prescription from a political subdivision, "a private person may acquire by acquisitive prescription the ownership of a property that a political subdivision holds in its capacity as a private person." See Professor A.N. Yiannopoulos, 2 La. Civ. Law Treatise § 104, p. 232-33 (2001). Furthermore, "unopened . . . streets and parish roads are private things, that is, things that the municipality owns in its capacity as a private person. These should be susceptible of acquisitive prescription." Id., citations omitted (emphasis original).
[5] QRR did not dispute the adequacy of the compensation paid in suit no. 342,775. Thus, the amount of compensation originally deposited by the City for that parcel, $8,000.00, was not deducted.
[6] Although the City failed to brief this assignment of error in it original appeal brief, it is within this court's discretion to address the assignment or not.